## 10833

### RUSSELL ET AL. v. RUSSELL ET AL.

### IN RE. RUSSELL'S ESTATE

#### (110 S. E. 791)

1. BASTARDS—EVIDENCE HELD TO PROVE CHILDREN LEGITIMATE AS AGAINST CONTENTION THAT PARENTS WERE NOT MARRIED.—On petition for appointment of administrator, involving issue as to whether petitioners, who claimed to be half brothers and sister of the deceased, were the legitimate children of deceased's father, evidence *held* to create a presumption that deceased's father and petitioners' mother were lawfully married, and that the petitioners were born in lawful wedlock.

2. BASTARDS—PRESUMPTION AS TO LEGITIMACY BECAME ARBITRARY AFTER LAPSE OF 20 YEARS WITHOUT INTERRUPTION.—Presumption that children were born in lawful wedlock, after a lapse of 20 years without interruption, became an arbitrary presumption as to the legitimacy of the children.

Before TOWNSEND, J., Greenwood. Reversed.

In the matter of the estate of Miss Mary Russell. Petition by L. H. Russell and others for appointment of W. H. Robinson as administrator, to which J. L. Russell and others filed objections. Judgment of Probate Court, granting petition, reversed by the Circuit Court, and the objectors appeal. Reversed.

*Messrs. Grier, Park & Nicholson,* for appellants, cite: *Presumption of legitimacy:* 101 S. C., 40; 2 McC., 227; 38 S. C., 49; 90 S. C., 246; 10 Rich., 70; 108 S. C., 276; 74 S. C., 410; 7 C. J., 490, 945.

*Messrs. Tillman, Mays & Featherstone,* for respondents, cite: *Proof of marriage:* 5 S. C., 411; Rich. Eq. Cas., 85; 9 S. C., Eq., 109; 108 S. C., 276.

February 27, 1922.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The appellants are the half brothers and a sister of Miss Mary Russell, who died intestate on the 27th of September, 1920, and the respondents are her first cousins. L. H. Russell, one of the appellants, filed a petition in the Probate Court for Greenwood County, alleging that she left surviving her, as her heirs at law and distributees, the said appellants, and asking that W. H. Robinson be appointed the administrator of her estate. The respondents filed objection to the appointment, on the ground that they were the sole heirs and distributees of the deceased.

The question whether the father and mother of the appellants were lawfully married at the time the appellants were born was argued before the Probate Judge, who decided that they were born in lawful wedlock, and granted letters of administration to W. H. Robinson. The respondents appealed to the Circuit Court, and the judgment of the Probate Court was reversed. The appellants then appealed to this Court.

His Honor, the Circuit Judge, thus states the facts upon which the respective parties relied, and upon which he based his conclusion that the appellants are not the legitimate children of James L. Russell, and not the legitimate brothers and sisters of the intestate, Mary Russell:

"The circumstances relied on to show a marriage between Jim Russell and Eliza Carroll are that he was in 1863, when he began living with her in a log house on Simmons Branch, a widower, and his general reputation was good; that he continued living with her, at one place or another, down to the time of his death in 1876, except for a short while after a visit of "regulators" to inquire into the manner of that life. During this time Eliza had five children, including the petitioners, who were recognized by him as his children, and attending school were called by his name. Mrs. Whitten, whose father, Dr. Sanders (?), was their family physician, told her, when a young girl, that they

were married, and she was taught to so regard them. Against these circumstances are the circumstances that Jim Russell left the home place, where Mary Russell and her brothers and sisters, his children by a prior marriage, lived, when he went to live with Eliza, and never brought her to the old home, and she was never recognized by the decedent or her full brothers and sisters as their father's wife, nor claimed such recognition. Neither of them ever told any witness that they were married, and she went by the name of Eliza Carroll until Jim Russell died. Roland Clem, a witness, tstifies that Jim Russell, while living with Eliza Carroll, told him he had no wife, and that Eliza was his woman, and it is testified that one Goldworthy told Russell he had as much right as Russell had to go to Eliza's. After being visited by regulators, they separated for a while. Neither Eliza nor her children were recognized by the family or kins-people of Jim Russell as his legitimate wife or children; the preponderating repute was that the relations between Jim and Eliza were not those of marriage; Eliza never married after the death of Jim, and eight years after his death she gave birth to a daughter, whom she called by his name."

The Probate Judge took a different view of the testimony, as will be seen by this statement in his decree:

"The testimony satisfies me that at the time of her death Miss Mary Russell left surviving her, as her heirs at law and distributees, her half brothers and sisters, L. H. Russell, Thomas Russell, Mrs. Rebecca Russell Fuller, and David Russell. She left no brothers or sisters of the whole blood, nor any children of brothers or sisters of the whole blood. The defendants, who contested the appointment, are first cousins of Miss Mary Russell, deceased, and have no interest in the estate, unless it be held that their half brothers and sisters are illegitimate. The testimony on this issue, which is the sole issue in the case, does not satisfy me that

they were illegitimate. On the other hand, I am satisfied that the father and mother of these children lived together as man and wife for some 12 or 15 years, and were so living together at the time of death of the father. These children were raised by them, and the weight of the testimony tends to establish their legitimacy. The period of time in question was between the years of 1865 and 1874, and necessarily, after this great lapse of time, it is hard to produce witnesses to an actual ceremony of marriage; but the petitioners were able to produce witnesses who lived in the neighborhood at the time, and were able to testify as to the relationship of the parties. And, in connection with this, they were also able to produce a record which on its face shows to be genuine, in which the father undertook to make a record of the births of the several children. Against this testimony is produced the testimony of a few witnesses, which tends to show a different relationship between the parties. This testimony, however, is not sufficient in my mind to overcome the testimony produced by the petitioners, especially since it is founded upon rumors and conversations occurring over 50 years ago, and upon which I think it is unsafe to disinherit these children. For these reasons, I think letters of administration ought to be granted on the petition."

Perhaps it will make the statement of the testimony by the Circuit Judge clearer if we reproduce the exact language of two witnesses for the appellant. The first of these is Miss Mandy Blake, who testified as follows:

"I am 80 years old. I live about four miles from McCormick. I am not related to any of the parties to this suit. I knew Mr. Jim Russell. He lived on the Simmons branch in a little log house when I knew him. I knew Eliza Russell—she was Eliza Carroll before he took her. I don't know when they were married. I went over there after cows. They were living there as man and wife. They

had children while they were there. I don't know how long they lived there. I don't know when they moved there. I think it was before the war.

"Cross-examination: I don't know what year it was. I don't know whether they were married or not. I don't know what understanding was in the community. They were not living together in same house. I think it was before the war. I never heard it said that they had taken up together.

"Redirect: I don't know how I could tell people were married. I was in their house once or twice. Neither one of them told me anything about their marriage."

The other one is Mrs. Cornelia Whitten, who thus testified:

"I live at Laurens. I am 71 years old. I knew Mr. Jim Russell. I lived at McCormick then. I have seen his wife, Eliza. They lived together as man and wife. I heard my father say they were married. He was their doctor. I knew them for years after they lived together. Mr. Russell and my husband worked together in the mines. Mrs. Russell lived with him then. I knew all the Russells. Mr. Russell's first wife was dead. They had six children while I knew them. He recognized these children as his children, and raised them up until he died.

"Cross-examination: L. H. Russell was born in 1865, but I don't know what month. I was living at McCormick. Mr. Russell was living on Simmons branch. Mr. Russell died first. We had left there when Mr. Russell died. I don't remember when Mrs. Russell died. We left McCormick about 30 years ago. When we left McCormick, Mr. Russell was living on Simmons branch. He had three or four children when he lived on Simmons branch. I knew him. He married about 1863, second time. I was not present at marriage, but heard my father talk about it. I was always taught he was married. I don't know, except what I heard people say."

In Ex parte White, 38 S. C., 41; 16 S. E., 286, the Court used this language:

"It is argued that, if all the facts relied on to set aside the appointment of Peeples have been found against the applicant, there still remains the point of law, that she claims to be the only living legitimate child of the intestate, and that Rowland W. Peeples, being illegitimate, is not entitled to retain the administration. It is a delicate matter to declare one not in fault to be illegitimate, and the Court will not do so, unless in the administration of the law it becomes necessary."

The third rule is thus stated in *Dinkins v. Samuel,* 10 Rich., 66:

"If charitable presumptions are brought to the aid of questions of fact, of circumstances and transactions obscured by the dust of antiquity, surely all will agree that such vigilance and such presumptions are eminently due from Judges and juries, when, to the usual basis of them, is added the question of the good name of those who are dead and living, and the title of the latter to the immunity of the law's notice and protection. It is well said, therefore, in the case of the Legatee and Executrix of *William Johnson, Jr. v. Executor of William Johnson, Sr.,* 1 Des., 595, as follows: 'The evidence of legitimacy was very slight, but the Court would presume a marriage after the lapse of 30 years, especially as all the parties were dead; and if a contrary presumption should prevail, it would have the effect of bastardizing a person after his death, which would be contrary to every principle of law, justice and equity.' Indeed, we have venerable legal authority upon this point; for in Burg's Case, 5 Coke, 98 (b), it was resolved, under circumstances strongly adverse to actual belief, that children did really proceed from the putative father, as follows: '*Et semper praesumitur pro legitimatione puerorum, et filiatio non potest probari.*' "

This Court, in *Davis v. Whitlock,* 90 S. C., 233; 73 S. E., 171; Ann. Cas., 1913D, 538, quotes with approval the following from Bish. Mar. & Div., § 508:

"The rule ought to be—the writer regrets that he cannot refer to any case establishing the rule to be so in actual adjudication—that where the desire for actual, lawful marriage, as distinguished from a living together in the way of concubinage, is shown to exist in the minds of both the parties, and, such desire continuing, they are shown to dwell together as husband and wife but for a single day after the impediment is removed—this shall be held, not merely as raising a prima facie presumption of marriage solemnized after the impediment is removed, but as constituting marriage itself. Indeed, there are in such circumstances, both the matrimonial consent and the actual dwelling together in marriage, and there is the legal capacity to intermarry; if these do not constitute matrimony itself, in distinction from the mere evidence of it, where no formal solemnization is required, it is difficult to say what does."

In *Vaughan v. Rhodes,* 2 McCord, 227; 13 Am. Dec., 713, the Court uses this language:

"The second ground would probably have availed the defendant, if the fact on which he relies had been established. But none of the witnesses had known this woman for many years. They knew nothing of the illegitimacy of her child, except from the neighborhood report. And it is also reported that she had been married. On conflicting evidence of that sort, I think it was the most charitable, as well as most consistent with the principles of law, to presume in favor of legitimacy. A person ought not to be bastardized by mere rumor; which may be unsupported by any foundation. I think the verdict of the jury on this point was consistent with the law and the evidence, and ought to be conclusive of the fact."

In *Cave v. Cave,* 101 S. C., 40; 85 S. E., 244, this Court quotes with approval the following from Greenleaf on Ev., § 41:

"A condition proven to exist is presumed as a fact to so continue until another condition is proven to exist."

It also says:

"When the plaintiffs proved that Evan and Eliza occupied the same house and tilled the same soil for 30 years, and that they had six children born to them, which bore their name, the presumption arose that these children were legitimate. *Vaugan v. Rhodes,* 2 McCord, 227, 13 Am. Dec., 713. Thereupon the burden was shifted upon the defendants to prove that to be false which seemed to be true."

"A child is presumed to be legitimate until the contrary is shown. While the question of legitimacy has most frequently arisen, when marriage was claimed or proven, and the non-access of the husband or the validity of the marriage was at issue, the presumption of legitimacy was not limited to cases involving those questions. It has a wider application, and applies to every case where the question is at issue. If a former marriage is necessary to sustain the presumption, it will be assumed until contrary proof is given. In cases of conflicting presumptions, that in favor of legitimacy will prevail." 7 C. J., 940.

"The presumption of the fact of legitimacy is one of the strongest known to the law, and it cannot be overthrown, except by evidence which is stronger." Id., 945.

"The presumption indulged· in favor of legitimacy cannot be overcome by mere rumor. * * * It is based upon broad principles of natural justice and the supposed virtue of the mother. It is a branch of the general rule of equity and justice, which assumes the innocence of a person until there is proof of actual guilt; and whenever it is not inconsistent with the facts ·proved, this presumption is controlling. If a former marriage is necessary to sustain

the presumption, it will be assumed until contrary proof is given. * * * The presumption of marriage, arising from cohabitation, apparently matrimonial, is of course applicable to a case involving legitimacy." 3 R. C. L., 725.

In *Bradley v. Jennings*, 15 Rich., 34, the distinction between the two classes of presumptions is thus stated:

"Only 3 months were wanting to complete the full period of 20 years from the maturity of the single bill in this case to the commencement of this suit. The want of this short term, however, prevents the application of an arbitrary rule, just as the want of a single day would prevent the bar of the statute of limitations. Full 20 years is the time which the law, mostly from consideration of policy, has fixed as the basis for the artificial presumption which it raises independent of belief. Time short of this, when connected with other circumstances, may create a natural presumption by producing honest belief."

"The lapse of 20 years is sufficient to raise the presumption of a grant from the State, of the satisfaction of a bond, mortgage, or judgment of the grant of a franchise or the payment of a legacy, or almost anything else that is necessary to quiet the title of property. * * * It is said we cannot presume either a general administration or a valid will. It is hardly necessary to say that legal presumptions are not founded on actual belief. * * * Presumptions must be sometimes made against the well-known truth of the fact. If 20 years have elapsed without the payment of interest or any acknowledgment of a bond, we must presume it paid, notwithstanding the fullest conviction that it never has been paid." *Riddlehoover v. Kinard*, 1 Hill's Eq., 376, cited in *Corbett v. Fogle,* 72 S. C., 312; 51 S. E., 884; *Young v. McNeill*, 78 S. C., 143; 59 S. E., 986; *Powers v. Smith*, 80 S. C., 110; 61 S. E., 222; *Lewis v. Pope*, 86 S. C., 285; 68 S. E., 680; *Glenn v. Walker*, 113 S. C., 1; 100 S. E., 706.

In *Lewis v. Pope,* 86 S. C., 285, 68 S. E., 680, this Court quotes with approval the following language used by Colcock, J., who delivered the opinion of the Court in *Stockdale v. Young,* 3 Strob., 501, note:

"Presumptions may supply the place of positive proof. There are two kinds of presumptions. The one may be called a legal presumption; the other a presumption of fact. The first is wholly unconnected with the idea of belief—in fact, it is opposed to it. It is a mere rule of law, to supply those defects of our nature and the nature of things which cannot otherwise be guarded against; under this rule the party must rely on a long-continued and uninterrupted possession. The rule invests such possession with the title. I am never led to the consideration of this subject but my mind involuntarily recurs to the peculiarly happy and lucid exposition of the rule by Lord Chancellor Erskine. In the case of 12 Vesey, 266, 267, he observes that it has been said you will not assume unless you believe. 'But it is because there are no means of creating belief or disbelief that such general presumptions are raised upon subjects of which there is no record or written muniment. Therefore, upon the weakness and infirmity of all human tribunals, judging of matters of antiquity, instead of belief (which must be the formation of the judgment upon a recent transaction), where the circumstances are incapable of forming anything like belief, the legal presumption holds the place of particular and individual belief. Mankind, from the infirmity and necessity of their situation, must, for the preservation of their property and rights, have recourse to some general principal to take the place of individual and specific belief, which can hold only as to matters within our own time, upon which a conclusion can be formed from particular and individual knowledge.'"

The facts and circumstances attending the living together of James L. Russell and Eliza Russell were at least sufficient to create a reasonable infer-

ence or presumption that they were lawfully married, and that their children were born in lawful wedlock. There was nothing after the death of J. L. Russell in 1876 to break or destroy the continuity of such presumption. After the lapse of 20 years without interruption, this became an arbitrary presumption that the children were legitimate, and was not dependent upon actual belief of such fact. Under the testimony, herein public policy demands that the appellants should be declared to be the lawful heirs and distributees of the intestate, Mary Russell.

Reversed.