NORTH CAROLINA SCHOOL FOR DEAF AND DUMB v.
NORTH CAROLINA INSTITUTION FOR DEAF, DUMB
AND THE BLIND.

*State Charitable Institutions—Deaf and Dumb Asylums—
Bequest to poor Mutes—Kelly Trust— White and Colored
Beneficiaries—Apportionment of Fund.*

In 1851 a bequest for the education of "poor mutes" was made to the North Carolina Institution for the Education of the Deaf and Dumb and the Blind which had charge of both white and colored mutes and blind persons from 1881 to 1891, in which latter year an institution was established for the education of white deaf mutes of the State. The act establishing the last named institution did not authorize it to reduce said trust fund into possession; *Held*, in an action by the North Carolina school for the Deaf and Dumb against the North Carolina Institution for Education of the Deaf and Dumb and the Blind, for the possession of the fund and a library which had been purchased with the income therefrom, that plaintiff is not entitled to the possession of the *corpus* of the fund or to the whole of the library, but the library and the income from the fund should be divided between the white and colored deaf mutes of the State in proportion to the number of the pupils of each race as shown by the official reports of each Institution ; *Held*, also, that the defendant shall hold the *corpus* of the fund in trust to disburse the income yearly in the proportions stated and that it shall make at once the division of the library between the two Institutions.

Civil action to determine the rights of the parties to the "Kelly Fund" and library in the possession of the defendant, heard before *Starbuck, J.*, at April Term, 1895, of Wake Superior Court. Both parties appealed from the judgment which, together with the pertinent facts, is set out in the opinion of Associate Justice Montgomery.

*Messrs. Battle* and *Mordecai*, for plaintiff.
*Mr. Armistead Jones*, for defendants.

MONTGOMERY, J. : The defendant Institution had its origin in chapter 37 of the acts 1844-45 entitled "an act to provide for the education and maintenance of the poor and destitute deaf mutes and blind persons in this State." Under this act an annual appropriation was made for the maintenance of such poor and destitute deaf mutes and blind persons as were unable to pay f r such maintenance and education. The Literary Board was entrusted with the fund, and with the selection of the pupils. This Board also had the discretion either to send the pupils to the institutions of neighboring States, or to "hire" teachers to open school in this State. A beginning was made in Raleigh, and at the session of 1846-47 the General Assembly made an appropriation with which to erect suitable buildings for the conducting of the school, the buildings to be erected under the management of the President and Directors of the Board. Chapter 4 of the acts of 1848-49 repealed the act of 1844-45 so far as the last named act placed the institution under the management of the Literary Board, and vested its management in seven directors. These directors were required to appoint a President out of their number, and the name of the Institution was changed to that of the "President and Directors of the North Carolina Institution for the education of Deaf and Dumb." Another act of Assembly, ratified the 25th of December, 1852, changed the name to that of the present one of the defendant. "The North Carolina Institution for the education of the Deaf and Dumb and of the Blind."

The defendants, until a short time before the commencement of this action, had conducted the Institution for the education and maintenance of both the deaf and dumb and of the blind at Raleigh.

The plaintiff is a corporation created by Chapter 399, of the laws of 1891, for the purpose of conducting, near Mor-

ganton, a school for the white deaf and dumb children of North Carolina. Section 5 of the last named Act provides that "As soon as the said school shall be ready to receive pupils the board shall cause to be removed thereto the white deaf and dumb pupils who may then be in the Institution for the Deaf and the Dumb and the Blind in the city of Raleigh." Under this section the deaf and dumb pupils have been removed from Raleigh to Morganton.

In November, 1851, John Kelly, of the county of Orange, died leaving a last will and testament in which he bequeathed to the defendants and their successors in office forever six thousand dollars, the principal to be secured and the interest thereon used for the purpose of educating *"poor mutes."* The plaintiffs bring this action to have themselves declared trustees of the *corpus* of this fund, and that the defendants may be compelled to pay it over to them to be used in educating the deaf and dumb under their charge. The defendants admit that they received in 1854 most of this legacy, and that they have on hand of it at the present time $4,000 of 4 per cent State (N. C.) bonds, and also a library of considerable value suitable for the use of the deaf and dumb, but they aver that the plaintiffs are not entitled to the fund or to the books. The defendants in the court below, after answer filed, demurred *ore tenus* to the complaint and moved to dismiss the action upon the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was sustained in so far as the *corpus* of the fund is concerned, and overruled in so far as the income of the fund and the library are concerned: and it was further adjudged that the "plaintiff is not entitled to the *corpus* of the Kelly fund or any part of said *corpus*; and said *corpus* shall remain with the defendant and in its keeping, but that the plaintiffs are entitled to receive a proportionate part of the interest accruing

annually, the part of said income to which plaintiff is entitled being the proportion that the white population of this State bears to the colored population thereof, from the said fund, ; and it is further ordered by the Court that this be referred to Hon. J. B. Batchelor, to ascertain the amount of said fund and the interest upon same ; and what amount, if any, of the interest or principal of the 'Kelly fund ;' and if so, how much was used by defendant in purchasing a library, and the portion of said income to which plaintiff is entitled under this judgment."

Both the plaintiffs and defendants appealed from this judgment.

We see no error in the chief ruling made by his Honor, but in some of its details we will make slight modifications. There is no express power conferred upon the plaintiff in the Act incorporating them to reduce this fund into their possession, nor does it seem to us that the plaintiff's possession of it is at all necessary for its preservation and proper disbursement. In proper cases the courts would have the right to remove an old trustee and appoint a new one in his place, but we are of the opinion that the complaint in this action does not set forth matter sufficient to have the trust, which the testator reposed in the defendants, revoked, by the courts and placed in other hands. We are of the opinion further that the fund and the library ought to be used for the benefit of the deaf mutes of both the white and colored races. It is true that when the legacy was given to the defendants they had at their school no other than white mutes; yet in none of the Acts of Assembly concerning the government of the defendant Institution up to the time of the death of the testator was there any race discrimination in the selection of pupils. The first legislative Act directly concerning the government of this Institution in which such discrimination is to

be seen is the one of 1854 (*Revised Code*).  Section 8 of this Act confines the benefits of the Institution to the white deaf mutes.  It may be said that such discrimination was implied because of the severe denunciations of the criminal laws against those persons who might teach slaves to read and write, and because of the general policy of the law in reference to the institution of slavery.  However this may be, the testator made this bequest after the Act of 1848–49, which Act explicitly declares that "This Institution shall *in all things and at all times* be subject to the control of the Legislature ;" and that body, at its session of 1881, in Chapter 211, extended the benefits of education and maintenance to the colored deaf mutes of the State. And since the last named Act the defendants have had under their charge, in separate buildings in Raleigh, colored deaf mutes and blind.

We are of the opinion that the judgment below ought to be modified so as to divide the library and the interest of the fund between the white and colored deaf mutes of the State in proportion to the number of the pupils of each race who are, or may hereafter be, under the care and training of the Institutions now established, or to be hereafter established by the State; and that the official reports of such Institutions as to attendance shall be the basis of such apportionment.

It is the oppinion of the Court that the defendants hold this fund in the manner and for the purposes declared in this opinion, disbursing the interest yearly, and that they further give the use and possession of the library to the deaf mutes of both races as herein indicated, making the division of the books at once.

The Court understood in the argument that it was agreed between the counsel on both-sides that the defendants had on hand, of the funds in dispute, $4,000, in North Carolina

4 per.cent. bonds, and the library.  If however there be any contention about the amount or the value of the fund, a commissioner may be appointed to escertain the same. Affirmed and modified.

AVERY, J. (concurring): Concurring fully in the conclusion of my brother who delivers the opinion of the Court, I can not yield my assent to the reasons given for holding that colored mutes are entitled to a ratable share of the fund.  If the testator had bequeathed six thousand dollars in trust for the education of the colored mute children at the time when his will took effect, the bequest would have been declared void, because at the time it was illegal to educate such children.  If in express words he had named the "white mutes" as the beneficiaries it will be conceded without citation of authorities that it would have been a valid bequest to a class that could be easily ascertained and identified, and that, in the face of such a clear expression of an intent which it would have been at the time lawful to carry out, no part of the interest accruing from the fund could have ever been directed to any other use than that intended by Kelly.  But as he refrained from confining its benefits by express terms to white mutes the law presumes that he disposed of his property in contemplation of such changes as might be made in our laws and with intent that his bequest should inure to the benefit of all who should at any time fall within the classes of mutes for whose education the State might in future provide.  If the law had been so altered as to extend the benefits of tuition in her public schools to mutes up to the age of forty, those who were made beneficiaries by removing restrictions as to the age of pupils, would have been none the less entitled to share in the benefit of this fund, because the alteration was made subsequently to the testator's death.   The same principle that

would bring them within the class designated by the testator as *cestuis que trust* would entitle colored mutes, after they were made beneficiaries of the State, to claim the right to share in the testator's bounty.

If it be true that the legislature did not confine the priviledge of receiving instruction in the Institution exclusively to white pupils till after the death of the testator, it is not material, since other statutes, which must be construed along with those relating specifically to the education of mutes at that time, made it illegal to open schools for colored pupils. We are not at liberty to impute to the testator an unlawful, purpose, and hold that the courts must carry out his intent. But he might have given his bounty, intending that its application should be left dependent upon future changes in the law, like the loan, which proved a donation by the federal Government to the State for the benefit of the common schools.