## 12075

### STATE v. SELLERS

#### (134 S. E., 873)

1. BIGAMY.—Bigamy was not a crime at common law.
2. BIGAMY.—Prior marriage as foundation of crime of bigamy, under Cr. Code, 1922, § 374, must be such as is recognized in the law.
3. BIGAMY.—A voidable but not a void first marriage is sufficient foundation for crime of bigamy.
4. MARRIAGE.—Marriage of 11 year old girl *held* voidable and not void.
5. MARRIAGE.—Voidable marriage of 11 year old girl *held* not abrogated by separation by mutual agreement four weeks later and before girl attained the age of consent, in view of Const. Art. 3, § 33, and Civ. Code, 1922, §§ 5531-5533.
6. MARRIAGE.—Common-Law rule as to age of consent to marriage is unchanged in South Carolina.
7. BIGAMY.—Defendant's first marriage *held* void and insufficient foundation for charge of bigamy, having been contracted with one who had previously entered into a marriage voidable for want of age but never in fact annulled.

Before FEATHERSTONE, J., Marlboro. Reversed.

Dock Sellers was convicted of bigamy, and he appeals. Reversed and verdict of not guilty ordered entered.

*Messrs. M. E. Crosland* and *N. W. Edens,* for appellant.

*Mr. M. J. Hough,* for respondent.

September 30, 1926.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

The defendant, Dock Sellers, who was indicted, tried and convicted in the Court of General Sessions for Marlboro County for bigamy, has appealed to this Court. The record is meager, and the facts are not very clearly stated. It appears, however, that the undisputed and material matters, brought out in the trial, are as follows:

(1) That Linnie Bailey, when she was only 11 years of age, was married to Cy Reynolds.

(2) That Linnie, after living with Reynolds as his wife for about four weeks, left him, she being at the time still under the age of 12 years, and they have not since lived together as husband and wife.

(3) That, except as Linnie herself attempted to revoke the marriage to Reynolds, there has been no dissolution or annulment of such marriage. While Reynolds attempted to secure a divorce, it is admitted that this endeavor to do so was not legally accomplished.

(4) That thereafter Linnie married, or attempted to marry, the defendant, Sellers, with whom she lived a short while.

(5) That the defendant later married Edith Hewitt.

The State based its charge of bigamy against the defendant on account of his marriage to Edith Hewitt, when his marriage to Linnie Bailey (or Reynolds) was still of force. The defense was that the marriage of defendant to Linnie was not valid, because of her prior marriage to Reynolds, and that the marriage of defendant to Edith Hewitt was therefore valid and not bigamous.

At the close of the testimony, the defendant moved for the direction of a verdict of not guilty on the ground that all the evidence showed that the marriage of defendant to Linnie was void because of her prior marriage to Reynolds, and that defendant's marriage to Edith was legal. The Circuit Judge refused this motion on the ground that the marriage of Linnie to Reynolds was void on account of her age, and that her marriage to the defendant was valid.

The Judge charged the jury as follows:

"If you are satisfied from the evidence that at the time Linnie Bailey undertook matrimony with Cy Reynolds in 1908 she was under 12 years of age, then I charge you that any attempted marriage on her part was null and void, and that would not prevent her from contracting legal matrimony with the defendant in 1920."

The appeal alleges error in refusal to direct a verdict of not guilty, and in charging the law as quoted above. Both the assignments of error will be disposed of together, as they raise the same question.

"Bigamy was not a crime at common law, but an offense of exclusively ecclesiastical cognizance." By statute, it was made a felony in England. 3 R. C. L., p. 796. It seems the first legislative enactment in this State, defining the crime and fixing the punishment therefor, took place about the year 1712. Our present law on the subject is found at Section 374 of Volume 2 of the Code of 1922, and is as follows:

"Whoever, being married, and whose husband or wife has not remained continually for seven years beyond the sea, or continually absented himself or herself, the one from the other, for the space of seven years together, the one of them not knowing the other to be living within that time, or who were not married before the age of consent, or where neither husband nor wife is under sentence of imprisonment for life, or whose marriage has not been annulled by decree of a competent tribunal having jurisdiction both of the

cause and the parties, shall marry another person, the former husband or wife being alive, shall, on conviction, be punished by imprisonment in the penitentiary for not more than five years nor less than six months, or by imprisonment in the jail for six months, and by a fine of not less than five hundred dollars."

It will be observed from the first three words of the statute, "Whoever, being married," and the later expression therein, "shall marry another person, the former husband or wife being alive," that it is necessary before one may be convicted of the crime of bigamy that it must be established that he was married to another person. The prior marriage necessary to sustain the offense, as defined in the statute, must, of course, be such a marriage as is recognized in the law.

While it must be shown that the defendant, in a bigamy case, had contracted a first marriage at the time of his attempted second marriage, it appears that if the first marriage was voidable, and not void, yet the crime is complete. The general rule seems to be this:

"The foundation of the crime of bigamy is always a valid first marriage, which is in fact a part of the *corpus delicti,* and the pressure in point of evidence usually relates to it. It must be proved as a fact and the question of its validity must be determined by the law of the place where the ceremony took place. The evidence should show that the parties in some form before some duly authorized person, where common-law marriages are not recognized, declared that they took each other for man and wife; and this contract of marriage alone is sufficient whether or not it was followed by cohabitation. *If the prior marriage is void the subsequent marriage is legal, as bigamy can occur only through the marriage of a person already married.* [Italics ours.] A good example of these principles occurs where a man marries a second wife in the lifetime of the first, and then the first marriage is dissolved by death or divorce, and

he marries a third wife, in which event he can be convicted of bigamy for the second marriage but not for the third. The second marriage is a nullity and the third marriage is binding. Of course, there may be cases where the cohabitation with the second wife after the termination of the first marriage operates as a common-law marriage. If, for example, the second wife knows the facts in regard to the first marriage and after its termination consents to live with the man openly as his wife, she may thereby acquire the status of a wife; but if she never knew of the first marriage and never entered into a new contract of marriage after the termination of the first marriage there can be no question that the second marriage would be void so far as a prosecution for bigamy is concerned. But although a void first marriage is insufficient on which to found a charge of bigamy a marriage merely voidable may be enough. *So a marriage with a person under the age of consent, or even one solemnized by an unauthorized person, may be a valid basis for a prosecution for bigamy.*" [Italics ours.] 3 R. C. L., p. 799, Par. 7.

Pointing, as authority, to decided cases from jurisdictions other than our own, to sustain the doctrine that a voidable marriage, made so because of the want of age in one or both of the contracting parties, will sometimes support a charge of bigamy, *Corpus Juris* has this to say:

"A voidable marriage will support an indictment for bigamy, inasmuch as it is binding, in general, on the parties thereto until it is set aside under a direct proceeding instituted for that purpose. A prior marriage, voidable for the want of legal age of either or of both, of the contracting parties, will sustain a conviction for bigamy, unless such marriage has been judicially annulled because contracted under the statutory age of consent, unless there was a separation with the consent of the minor before attaining majority, or unless the marriage was not confirmed by co-

habitation after arriving at the age of consent." 7 C. J., 1159.

Agreeable to the view that it is only necessary to establish a "voidable marriage" to support an indictment for bigamy is the case of *State v. Smith,* 101 S. C., 293; 85 S. E., 958, Ann. Cas., 1917-C, 149. In that case, the defendant had first married his niece of the half blood; without any annulment of that marriage, and while the first wife was still alive, he married again. This Court held that at the time of the marriage to the niece such marriage was not void under the law of this State, but only voidable, and, since there had been no proceedings to have the same declared invalid, the second marriage was bigamous. In the opinion therein, Mr. Justice Hydrick quoted with approval the distinction between void and voidable marriages, as laid down by Mr. Bishop, which we set out:

"A marriage is termed void when it is good for no legal purpose, and its invalidity may be maintained in any proceeding, in any Court, between any parties, whether in the lifetime or after the death of the supposed husband and wife, and whether the question arises directly or collaterally. A marriage is voidable when in its constitution there is an imperfection which can be inquired into only, during the lives of both of the parties, in a proceeding to obtain a sentence declaring it null. Until set aside, it is practically valid; when set aside, it is rendered void from the beginning."

While, as pointed out, a prior voidable marriage will sustain an indictment for the crime, "an indictment for bigamy cannot be sustained, where the prior marriage was void." 7 C. J., 1158.

In the case at bar, the marriage of Linnie and the defendant was, clearly, not a voidable marriage. That contract of matrimony was either void *ab initio,* or absolutely valid. Since it is admitted that the defendant had full capacity in the law to enter into that contract, the inquiry leads to an

examination into the capacity of Linnie to do so. Obviously, if the marriage of defendant to Linnie was void *ab initio* as to her, it was likewise so void as to the defendant. Then, the pivotal point is the legal capacity of Linnie to marry the defendant. To ascertain if Linnie was free to marry him, we must turn our attention to her marriage to Reynolds and her status thereafter.

It is a conceded fact that at the time of the marriage to Reynolds Linnie was only 11 years of age. With reference to that marriage, the Circuit Judge held on the motion to direct the verdict and in his charge to the jury that because of her age such marriage was absolutely void, and not voidable. If he was correct, then Linnie and the defendant had the right to contract their marriage, and it would follow that the defendant could not legally marry Edith.

The whole case, then, seems to revolve around two 4, 5 questions: Was Linnie's marriage to Reynolds void or voidable? If voidable, could she by her own act annul it? In order to answer the first question, it is necessary to make inquiry concerning the law of this state as to the age at which a female may contract matrimony. The statute law seems to have been altogether silent in this regard until the passage of the regulations as to the issuance of licenses for marriage. The license marriage act, however, could not have any effect as to the marriage of Linnie to Reynolds, since such marriage occurred in 1908, prior to the passage of that legislation. But if that law, as it now appears in our Code, had been of force in 1908, it is doubtful if it would have had any effect upon the marriage of Linnie to Reynolds, when she was only 11 years of age, for, while it is necessary for the "woman, or child woman," to be at least of the age of 14 years before a license for her marriage may be granted, and while it is a misdemeanor for the marriage of a girl under 14 to be performed, still the law has a provision that nothing contained therein shall

render any marriage illegal when no license therefor has been issued.

In Section 33 of Article 3 of the Constitution of 1895, there is this provision:

"No unmarried woman shall legally consent to sexual intercourse who shall not have attained the age of fourteen years."

But this language can have no reference to the age at which a woman can consent to matrimony. The rule at common law was that an unmarried female under 10 years of age could not consent to sexual intercourse. The evident purpose of the constitutional provision was to raise that age to 14 years. We do not see how it affects the age at which a woman may marry.

The legislative power not having been invoked concerning the age at which persons may contract matrimony, the rule of the common law was, and is yet, of force, since that system of jurisprudence obtains in this state until it is altered, modified, or repealed by enactment of the lawmaking body. It becomes necessary, then, to look back to the common law for light on the subject under investigation.

"At common law a marriage of persons under the age of seven years was a nullity, but over that age, and under the age of consent, the marriage was not absolutely void, but only voidable." 18 R. C. L., p. 441, par. 70.

Mr. Blackstone, discussing the subject of marriage, had this to say:

"The next legal disability is want of age. This is sufficient to avoid all other contracts, on account of the imbecility of judgment in the parties contracting; *a fortiori,* therefore, it ought to avoid this, the most important contract of any. Therefore, if a boy under 14, or a girl under 12 years of age, marries, this marriage is only inchoate and imperfect; and, when either of them come to the age of consent aforesaid, they may disagree and declare the marriage void, without any divorce or sentence in the spiritual

Court.  This is founded on the civil law.  But the common law pays a greater regard to the constitution, than the age, of the parties; for if they are *habiles ad matrimonium* (fit for marriage), it is a good marriage, whatever their age may be.  And in our law it is so far a marriage, that, if at the age of consent they agree to continue together, they need not be married again.  If the husband be of years of discretion, and the wife under 12, when she comes to years of discretion he may disagree as well as she may; for in contracts the obligation must be mutual; both must be found, or neither; and so it is *vice versa,* when the wife is of years of discretion and the husband under."  Volume 1, Book 1, Cooley's Blackstone (4th Ed.), 436.

Adverting to the facts of this particular case, with the endeavor to apply to them the law as given by the great commentator, it would seem that if the common law alone is to govern, the following would be the situation:  Linnie being under the age of 12 at the time of her marriage to Reynolds, that marriage was "inchoate and imperfect." When she came to the age of consent, namely, 12 years, with or without the consent of Reynolds, she had the right to declare the marriage void, and it was not required of her to go into any Court for that purpose.  This, of course, would have given her the right to marry the defendant, and such marriage between them would have been legal and valid in all respects.  Not only did Linnie have the right under the common-law rule to annul her marriage to Reynolds, but, under that same rule, Reynolds had the same right to revoke that particular marriage when Linnie arrived at the age of 12, or any time prior thereto; and such action on his part would have cleared the way for Linnie to marry the defendant.

But more and more as civilization has advanced, and as woman has come to be recognized as more than a chattel in the eyes of the law, and to prevent the stamp of illegitimacy being placed upon innocent children, the harsh rule of the

common-law has been changed by statute. The tendency
of legislation has been toward the protection of "women-
children" and their children.

While it does not appear that the common-law rule, as to
the age at which persons may marry, has been changed by
legislative enactment, there are some statutes of force in the
State which we think directly bear upon this subject, and are
applicable to the case at bar. We find in Volume 3, Code of
1922, in the same chapter wherein is written our marriage
license act, three sections which we consider of great im-
portance in the consideration of the matter before us. They
are as follows:

5531. "When the validity of a marriage shall be denied or
doubted by either of the parties, the other may institute a
suit for affirming the marriage; and, upon due proof of the
validity thereof, it shall be decreed to be valid; and such
decree shall be conclusive upon all persons concerned."

5532. "The Court of Common Pleas shall have authority
to hear and determine any issue affecting the validity of
contracts of marriage, *and to declare said contracts void for
want of consent of either of the contracting parties* [italics
added], or for any other cause going to show that, at the
time the said supposed contract was made, it was not a con-
tract: *Provided,* that such contract has not been con-
summated by the cohabitation of the parties thereto."

5533. "All marriages contracted while either of the
parties has a former wife or husband living shall be void:
*Provided,* that this section shall not extend to a person
whose husband or wife shall be absent for the space of
seven years, the one not knowing the other to be living dur-
ing that time; nor to any person who shall be divorced, or
whose first marriage shall be declared void by the sentence
of a competent Court."

The section last cited seems to have come into our law in
1712, about the same time when the statute against bigamy,
Section 374 of Volume 2 of the Code, already set forth,

was enacted. Section 5531 was apparently enacted about 1872, while Section 5532 seems to have passed in the General Assembly in 1882. These three sections, as well as Section 374 of the Code, were of full force at the time of the marriage of Linnie to Reynolds, also, when Linnie married the defendant, and again when the defendant married Edith. Accordingly, it is proper to bring all four of the cited sections to bear upon the facts of this cause.

Before the provisions of Sections 5531 and 5532 became a part of our law, it was held time after time that there was no Court in this State with power to annul a marriage for any cause. *Mattison v. Mattison,* 1 Strob. Eq. (20 S. C. Eq.), 387; 47 Am. Dec., 541. *Bowers v. Bowers,* 10 Rich. Eq. (31 S. C. Eq.), 555; 73 Am. Dec., 99.

Sections 5532 and 5533, from Volume 3 of the Code, were ably considered and discussed in the case of *Davis v. Whitlock,* 90 S. C., 233; 73 S. E., 171, Ann. Cas., 1913-D, 538, and it was definitely decided in that case that the Court of Common Pleas, as now constituted, had the power to declare a marriage void for want of consent of either of the contracting parties, or for any other cause, showing that at the time the supposed contract of marriage was made it was not a contract: *Provided,* that such marriage had not been consummated by the cohabitation of the parties.

Following the able reasoning of Mr. Justice Woods in the *Davis case,* which was concurred in by the majority of the members of a strong Court, we are inclined to think that we may go perhaps another step or two in the matter of protecting young womanhood and saving little children the stigma of being pronounced illegitimates; and it is clear to our minds that the Legislature intended this to be done.

Prior to the passage of the laws now set forth in the sections to which we have invited attention, it must have been apparent that it was harmful to womanhood, and to public morals in general, to follow the rule of the common law that either or both parties to a marriage, where the boy

had been under 14 years of age, or the girl under 12 years of age, should have the right to annul their marital vows when either· or both of them had come to "the age of discretion," and thus bastardize children who would have been made legitimate in all respects if their father and mother had seen fit to live together for even a day after their arrival at the age of consent. The General Assembly of South· Carolina, undoubtedly, intended to correct this evil, and we think the statutes mentioned were enacted for that purpose, and have aided in doing so.

By these enactments, the Court of Common Pleas was thrown open to all persons who denied or doubted if they were legally married. That Court was given authority to hear and determine any issue· affecting the validity of contracts of marriage and to declare such contracts void where it is shown that there had been no legal consent of the contracting parties. The very wise provision is contained in the law, however, that no marriage should be annulled for· want of consent, or for any cause going to show that, at the time the supposed contract was made, it was not a contract, if such marriage had been consummated by cohabitation of the parties thereto. It cannot be doubted that one of the main purposes of the proviso in Section 5532 was to keep children from the stain of illegitimacy.

Other reasons which, to our mind, must have moved the General Assembly to require questions pertaining to the validity of marriages· to be passed upon by a Court of record, were to give the parties vitally interested in the marriages, which might ·be disputed, as well as the public generally, information as to the status of persons who might claim at some time to be married and at other times not to be bound by the ties of matrimony. If the loose method of the common law, as to the annulment of marriages of persons under the age of consent, should be held to be of force in this State, it would be difficult, indeed, in many instances, to know if certain stated persons were married or unmar-

ried. Under the common-law rule, as we understand it, a man could marry a girl under the age of consent, and before she arrived at that age there might be an annulment with the mutual consent of both parties, or at the instance of either of them. Later the contracting parties, when both of them had arrived at the age of consent, might resume their marital relations and thereby ratify the former voidable marriage. It would be almost impossible for one who had to deal with persons in this situation to be informed as to the proper course to pursue, in many important transactions of life, including, for instance, the sale of real estate, where the dower right of a woman would be involved. There would be no public record of the annulment of a marriage of infants under the age of consent. On the other hand with the Court of Common Pleas open for the determination of questions pertaining to the validity of such marriages, all who are interested in ascertaining if a marriage of infants is still of force may make an examination of public records to ascertain if there has been a judicial decree affirming or annulling the questioned marriage. The tendency in this day is for the keeping of records of those who contract matrimony, not only for the benefit of the contracting parties themselves, but for the public good. Even before it was deemed necessary to keep a public record of marriages, it was deemed most wise that a public record be kept of annulments of disputed marriages, when it was determined that the marital contract had not been legally assented to. It is not mere conjecture for us to think that when the statutes, which we have set out, became the law of the land that the legislative intent included the idea that some Court should make and preserve for all time records of annulled marriages.

We are of the opinion that when the lawmaking branch of our government said to those who doubted or denied the validity of their marriage contracts that they could have all questions pertaining to such validity passed upon and

determined by a Court of justice, that it was a repeal, and, certainly, a modification of, the loose manner in which marriages were annulled in the common law by persons who had entered into that state before the age of consent. The practical effect of this legislation was to say to boys under 14 and girls under 12:

"Since you entered into the contract of matrimony before reaching that age in life when you had 'discretion' to undertake such a serious responsibility, you may have your voidable contract declared void, but you cannot do so without the aid of a competent tribunal, and such Court will not even change your statute if you have consummated your contract by cohabitation; you may be relieved of your duty to each other, but you cannot cast off your responsibility to your children, not even a possible unborn child."

To summarize in one short statement: We hold that while the common-law rule as to the age of consent for marriage has not been changed in this State, we do conclude that the common-law right of a person to a marriage contract, voidable because of want of age of one of the contracting parties, to annul the same by his or her own act, without a decree of the Court of Common Pleas, has been abrogated, and such marriages may only be declared void by that Court when there has been no cohabitation between the contracting parties.

This conclusion, we are pleased to say, is in line with the general tendency of modern legislation touching the subject of void and voidable marriage as the following will show:

"It has been laid down as a general rule that canonical impediments to marriage, such as consanguinity, affinity, impotence and the like render a marriage merely voidable, while the so-called civil disabilities, such as want of age, idiocy, lunacy, and the like, which prevent by reason of lack of capacity to contract the creating of a marital status, make a marriage void *ab initio*. But whether a marriage should be treated as entirely void, or should be open to attack only

in a specific proceeding brought by certain persons, is purely a question of policy for the Legislature, and the general rule above stated must be cautiously applied in view of the fact that statutes both in England and America have greatly modified the ancient law of valid marriages, and that the legislative tendency is to make marriages voidable rather than void, whenever the impediment is such that it might not have been readily known to both parties before marriage, and where public policy does not rise superior to all considerations of private utility. Modern civilization strongly condemns the harsh doctrine of *ab initio* sentences of nullity. A definition of voidable and void marriages which will closely fit modern conditions is that a marriage may be considered voidable through prohibited by law when it is possible, under any circumstances, for the parties to contract the marriage, or subsequently to ratify it, while it should be considered void if it is impossible for them under the law to contract it, and if it is impossible for them subsequently by any conduct to ratify it, and if the statute expressly declares that the marriage is void.'    18 R. C. L., p. 429, Par. 68.

The law, as we have announced in to be at this time, was the law at the time of the three marriages, related before, which have given rise to this cause.

Referring to the facts in the case at bar, it is bound to appear, therefore, that the marriage of Linnie to Reynolds was not absolutely void, but voidable. This is in accord with the definition of a voidable marriage as laid down by Mr. Bishop. It also harmonizes with the rule as stated in Ruling Case Law, mentioned above, for it was possible for Linnie and Reynolds to subsequently ratify the marriage contract which they had undertaken. Under the common-law rule of force here, she had the right to contract that marriage although not 12 years of age at the time. And Reynolds had the legal right to enter into matrimony with her. When she came to the "age of discretion," to wit, 12 years, if there had been no consummation of the mar-

riage by cohabitation, she could have made application to the Court of Common Pleas for an annulment of that voidable contract, and that Court had the power, for proper cause, to set the marriage aside, as pointed out in *Davis v. Whitlock, supra.*

Since the marriage of Linnie to Reynolds was not void, it must follow that her marriage to the defendant was void. This view is positively sustained by the provisions of Section 5533 of Volume 3 of the Code, which we have heretofore set forth. That section declares outright that Linnie's marriage to the defendant was void if her former husband (Reynolds) was living at the time she contracted the marriage with the defendant, unless Reynolds had been absent for the space of seven years and Linnie was not aware that he was living during that time, or unless Linnie had been legally divorced, or unless her marriage to Reynolds had been declared void by the sentence of a competent Court. Since Reynolds had not been absent for the space of seven years, as there had been no divorce, and as her marriage had not been declared void by the sentence (decree) of a competent Court, the language of the section, preceding the proviso therein, condemned her marriage to the defendant for the reason that her former husband, Reynolds, was living at that time.

It is our opinion that the learned Circuit Judge was confused as to the common-law distinction between void and voidable marriages, and that he overlooked the statutes to which we have called attention, and therefore, he committed error in both his refusal to direct a verdict, and also in his instructions to the jury.

We are not unmindful of certain conditions which may be brought about because of the conclusions we have reached in this cause. It is true that instances may arise in the future, as they have arisen in the past, that very young girls may contract unfortunate marriages from the bonds of which they would like to escape when a maturer age is

reached. It may seem hard to say to a girl, who, prior to the age of 12 years, has contracted, in her indiscretion, a matrimonial alliance which will only bring to her tears and sorrow, that she cannot by her own act alone avoid the results of her indiscretion. It may be, too, that the law of this State as to the recognition of marriages of children. within the age of 12 years is not for the best interest of our citizenship. There are strong arguments in favor of both sides of the question. It is not the province of this Court to make law; it is our simple duty to declare the law as made.

If the law, however, is not as we have construed it to be, undoubtedly, worse situations can arise than those pointed out by the distinguished lawyers and learned Judges who have opinions contrary to those expressed by us. If the common-law rule as to the annulment of a marriage, entered into when one or both of the contracting parties is under the age of consent, should be held still in vogue in South Carolina, then, clearly, the right given to the female to declare such marriage at an end must also be recognized when the male seeks to exercise it. Under the view that the common-law right to annul an infant marriage, regardless of whether or not there has been cohabitation, is recognized in this State, the man with "uxorious inclinations" could go through the form of a marriage ceremony with any number of girls from 7 to 12 years of age, "graze" in many "pastures green," and at his own sweet will cast aside all of his duties and obligations to the child wives with the simple declaration that he had annulled the marriage.

We realize that our view of the law will acquit one whose conduct is far from blameless. It is not proper at this time for us to pass upon the probable guilt of the defendant as to to other violations of the laws of the State in the acts committed by him. The only question for us to determine is his guilt, if any, under the law as to the crime of bigamy, for which he was indicted.

The status of Linnie Bailey Reynolds, child wife in this cause, has been well and duly considered. The Court, of course, has hesitated to declare any child which may have been born to her of her marriage to the defendant as illegitimate. To hold otherwise, however, would result in a declaration that any child born to her of Reynolds, or any child born to the defendant and Edith Hewitt, of their marriage, would have to be pronounced as bastards.

Unfortunately, the Court is not in a position to undo the great harm which has been occasioned by the girlish act of Linnie in marrying at an age so early, when she was so unprepared to realize the privileges, duties, and responsibilities of a contract of matrimony. These unfortunate instances have occurred numerous times in the past; likely, many more of them will come about. We can only hope that the efforts of the State to educate its youth and that the beneficent influences of Christian fathers and mothers, with such aid as the legislative power may be able to give, will, in some good day, make it unnecessary for our Courts to be required to determine the perplexing problems brought into existence by those "who marry in haste to repent at leisure."

The judgment of this Court is that the judgment of the Court of general sessions of Marlboro County be, and the same is hereby, reversed; and, as provided in Rule No. 27 of this Court, a verdict of not guilty is ordered to be entered up in favor of the defendant in the case at bar.

MESSRS. JUSTICES WATTS and STABLER concur.

MR. CHIEF JUSTICE GARY did not participate.

MR. JUSTICE COTHRAN (dissenting) : As is said by Mr. Justice Hydrick, in the case of *State v. Smith,* 101 S. C., 293; 85 S. E., 958; Ann. Cas., 1917-C, 149:

"Questions affecting marriage and its consequences are of grave importance to the citizens and the State, and they deserve the most careful consideration.

The guilt or innocence of the defendant of the charge of bigamy is not alone involved in the determination of this appeal; the questions involve the peace and quiet, the mental repose, the moral status, of many who have contracted marriage, and the legitimacy of their children. As has been stated, the commonwealth, as the guardian of its citizens, is a silent partner in every marriage. I do not concur in the disposition of this case, indicated in the opinion of Mr. Justice Blease, and submit herewith the grounds of my dissent.

The undisputed facts are these: In the year 1908, Linnie Bailey, a girl of between 11 and 12 years of age, a mere child, went through the form of a marriage ceremony with one Cy Reynolds, whose age does not appear in the record; they lived together as man and wife for a period of four weeks; at the end of this time, she not having reached the age of 12 years, they "separated by mutual agreement." It appears that Reynolds moved to North Carolina, and in 1916 he instituted divorce proceedings in the Courts of that State, served the summons by publication, and secured a decree of divorce against Linnie Bailey Reynolds, who was then living in Dillon County, S. C. In the year 1920, when she was about 23 years of age, she went through the form of a marriage ceremony with the defendant, Dock Sellers, with whom she lived for a short while. They separated, and in the year 1924, Dock Sellers went through the form of a marriage ceremony with another woman, Edith Hewitt, and has cohabited with her ever since. This last alleged marriage is the basis of the indictment for bigamy, upon which he was tried and convicted before his Honor Judge Featherstone, at a time not stated in the record. From the sentence of the Court, the defendant has appealed.

The contention of the defendant, in brief, is that the marriage between Linnie Bailey and Cy Reynolds, by reason of her not having reached the age of consent to marriage, 12 years, was a voidable contract; that it has never been

annulled by a Court of competent jurisdiction; that the alleged divorce obtained by Reynolds in North Carolina was ineffective by reason of the want of personal service upon Linnie Reynolds; that she was therefore incapable of effecting a legal marriage with Dock Sellers in 1920; and that therefore his marriage with Edith Hewitt was not bigamous. The conclusion is irresistible if the premises are found to be sound.

The case then turns upon the question of the strength of the ligament which bound Linnie to Reynolds at the time she married Dock Sellers. If at that time she was the lawful wife of Reynolds, her marriage with Sellers was void, and his marriage with Edith Hewitt was valid and not therefore bigamous.

His Honor, the presiding Judge, held that by reason of the fact that at the time of the alleged marriage of Linnie Bailey with Reynolds she had not attained the age of consent, 12 years, the marriage was void; that her marriage with the defendant in 1920 was consequently valid; and that the defendant's marriage in 1924, with Edith Hewitt, was bigamous. In this he may have been in error, but as the admitted facts show that long before the defendant's marriage with Linnie Reynolds the infant marriage between her' and Reynolds had been annulled by both parties to it, the conviction should stand.

The prominent facts must not be lost sight of: Linnie at the time of her so-called marriage with Reynolds was a mere child, 11 years old; within a month they mutually agreed to separate, to consider the alleged marriage as at an end; 12 years afterwards, in 1920, she married the defendant, Dock Sellers; in the meantime, 12 years, she was living apart from Reynolds, and in 1916 he had obtained a divorce. Conceding that the divorce was ineffective, the fact remains that there was not the slightest evidence that she affirmed the tentative, inchoate, imperfect marriage with Reynolds, when she reached the age of consent, or at

any time thereafter. Between the time she reached the age of consent, in 1909, and the time Reynolds secured the ineffective divorce in 1916, they had had nothing to do with each other; and if there could be any doubt as to the disaffirmance of the marriage by Linnie, the divorce proceeding instituted by Reynolds is conclusive upon the question of disaffirmance by him, which alone was sufficient to annul the marriage.

The law of the case seems plain: At common law, which has not been altered by any Statute called to my attention, the age of marital consent in males was 14 years, in females 12. A marriage where either of the contracting parties was under 7 years of ·age was considered absolutely void. Confusion has arisen in my opinion, from a mistaken characterization of a marriage where both of the parties were over 7 years of age and one of them was under the age of consent. Such marriages have been characterized as void-able—an unfortunate and misleading term. As Mr. Schouler says in his work on Domestic Relations, § 24, they are neither strictly void nor strictly voidable, but inchoate and imperfect.

In *Smith v. Smith,* 84 Ga., 440; 11 S. E., 496; 8 L. R. A., 362, the Court says:

"Between 7 and 14 in males, and 7 and 12 in females, they (the authorities) all agree that an inchoate and imperfect marriage may take place, which is subject to be made good by mutual ratification or confirmation after the age of consent is attained."

Mr. Addison (3 Addison on Contracts, § 1374) says that the engagement of the parties is inchoate and imperfect, not absolutely void. Pollock on Contracts, star page 57, declares that it is not absolutely void, but good, if agreed to at the age of consent. Story on Contracts, § 124, that it is voidable at the will of either party. Stewart, M. & D., § 51, declares it void for all intents and purposes unless and until duly confirmed.

In the quotation from Blackstone, contained in the opinion of Mr. Justice Blease, this appears:

"Therefore if a boy under 14, or a girl under 12 years of age, marries, this marriage is only inchoate and imperfect."

To this I agree, and think that it correctly states the status of the parties under those circumstances. If "inchoate and imperfect," the very terms declare that it is not a marriage, and it is a misnomer to characterize as a "voidable marriage" that which is no marriage at all. All that that relation produces is the capacity of being validated by consent or cohabitation after the age of consent has been reached. If this be the proper interpretation of the relation, which strikes me as inevitable from the very description of it as inchoate and imperfect, requiring confirmation upon reaching the age of consent, there is not a particle of evidence tending to furnish this essential element.

But in addition to this lack of evidence, there is the conceded fact that after a period of four weeks, before Linnie attained the age of consent, she and Reynolds "separated by mutual agreement." If Linnie, at the age of 11 years, had capacity to enter into a relation susceptible of confirmation when she reached the age of 12 years, can any one suggest a sound reason why, at the age of 11 years and one month, she did not have the capacity to withdraw from that relation?

In the opinion of Mr. Justice Blease it is said: "When she came to the age of consent, namely, 12 years, with or without the consent of Reynolds, she had the right to declare the marriage void, and it was not required of her to go into any Court for that purpose." Why wait 11 months to do what she declared her purpose to do four weeks after the alleged marriage? While it is perfectly true that when the not absolutely void, but was merely an imperfect or inchoate imperfect contract may be disaffirmed, that does not neces-

sarily imply that it cannot be disaffirmed before that time arrives; and I can see no valid reason for so holding.

The quotation from 7 C. J., 1159, set forth in the opinion of Mr. Justice Blease, contains this statement:

"A prior marriage, voidable for the want of legal age of either or of both of the contracting parties, will sustain a conviction for bigamy, * * * unless there was a separation with the consent of the minor before attaining majority" (which I take to mean the age of consent to marriage).

In *People v. Slack,* 15 Mich., 193, it is held:

"Defendant married a woman under the age of consent and separated from her before she became of the age of consent, afterwards marrying another woman. Upon these facts a verdict of guilty was directed. Held error, as, if the separation was with the consent of the woman, the first marriage was void; otherwise, if it amounted to a desertion, instead of a separation."

In 38 C. J., 1283, it is said:

"The rule is clear that the marriage of an infant over seven years of age, but below the age of legal consent, was not absolutely void, but was merely an imperfect or inchoate marriage, subject to avoidance by a party at any time within nonage, but voidable only at the election of a party, and valid and binding until so avoided."

In Tyler on Infancy, 126, it is said:

"The better opinion now is, that parties marrying before the age of consent, may dissent to the marriage within nonage, and thus avoid it *in toto.*"

In *Eliot v. Eliot,* 77 Wis., 634; 46 N. W., 806; 10 L. R. A., 568, the Court said:

"If the plaintiff had capacity to become a party to such imperfect and inchoate or conditional marriage, he should have capacity to disaffirm it any time thereafter, before it has ripened into an absolute marriage, by invoking the authority of the Court to annul it under the Statute. (In

Wisconsin it is required by the Statute that the decree of the Court be applied for.)  No good reason is perceived why the parties should be compelled to remain in so unfortunate a position until the plaintiff becomes 18 years of age (the statutory age of consent).''

In the argument of counsel for the appellant occurs this statement:

''The agreed facts are that Reynolds and Linnie Bailey married in Dillon county in 1908, lived together about four weeks and separated by mutual agreement.''

If that be true, the marriage of Linnie Bailey and Reynolds was annulled by Linnie before she reached the age of consent; the case falls squarely within the rule declared in the Michigan case.  Consequently the marriage of Linnie with Dock Sellers in 1920 was valid, and that of Dock Sellers with Edith Hewitt in 1924 bigamous.

It does not appear that Linnie had any communication with Reynolds after she reached the age of consent; she did not go back to him after the first disaffirmance of their relations.  The fact that she remained away from him when she reached the age of consent, and ever afterwards, was in effect an affirmance of her previous disaffirmance of the relation, made within a month after the alleged marriage in 1908.  There was, therefore, not only an absence of evidence of affirmance when she reached the age of consent, but the strongest evidence that by her conduct she affirmed her previous disaffirmance.  If she had done nothing up to the time that she reached the age of consent, and continued to cohabit with Reynolds thereafter, it would have been held that she had affirmed the inchoate marriage; it is but fair to give her the benefit of her inaction after that period as evidence of her disaffirmance.  If on the day she reached the age of consent, she had left Reynolds, under an agreement of separation, there could have been no doubt of her disaffirmance.  How that would make out a stronger case of disaffirmance than disaffirming within a month of the

marriage and keeping away from him ever thereafter it is difficult to see.

The quotation from 7 C. J., 1159, in the opinion of Mr. Justice Blease, above partially reproduced, contains also the following statement:

"A prior marriage, voidable for the want of legal age of either, or of both, of the contracting parties, will sustain a conviction for bigamy, unless such marriage has been judicially annulled because contracted under the statutory age of consent * * * unless the marriage was not confirmed by cohabitation after arriving at the age of consent."

A somewhat involved statement, meaning obviously, that if the parties did not cohabit after arriving at the age of consent, a Court proceeding would not be necessary. This fact clearly appears in the case at bar.

As Judge Richardson remarks in the *Barefoot case:* "Now, then, laying aside the striking inconsistency of a man offering to defend himself by insisting that the first marriage was intrinsically immoral and sinful, and therefore a nullity, in order to arrest the criminal consequences and legal punishment of bigamy"—a position that the defendant assumes in this case, it must be borne in mind that the burden of proof is upon him to show that his marriage with Linnie was void because her marriage with Reynolds was still in force, a contention that is overthrown by the facts that Linnie disaffirmed it within a month, that she continued to disaffirm it after she reached the age of consent, and that Reynolds in 1916 disaffirmed it.

I have stated above that the ruling of the Circuit Judge that the marriage entered into when Linnie Bailey was only 11 years of age was absolutely void *"may have been in error,"* and I advisedly underscored these words. I am convinced that he was right, and that the spirit of our laws, regardless of what has been enacted or decided elsewhere, sustains that view.

All concede that the common-law rule as to the age of marital consent obtains in South Carolina; that under the age of 12 years a woman child is incapable of consenting to marriage. It is held by practically an unbroken line of text-writers, regardless of South Carolina Statutes and decisions, that between the years of 7 and 12 a woman child may lawfully establish a relation which by cohabitation or affirmance at and after attaining the age of 12 years is made to date back to the tentative marriage and validate what she then was incapable of establishing. The doctrine appears to me as illogical and savage. Under it a child who has passed her seventh birthday by a day may be seduced into a relation, which if not disaffirmed when she passes her twelfth, then in a state of helpless immaturity, ties her forever to a human brute.

I think that we had much better stand by the rule announced by the Court 80 years ago in the case of *State v. Barefoot,* 2 Rich. (S. C.), 209:

"And true it is, if the first marriage had been thus absolutely void in law, as if a boy under 14 and a girl under 12 years of age had passed through the form and ceremony of marriage, such would be the inconsequential operation and effect, and the second marriage of either, when of lawful age, and to another person, would not constitute bigamy."

The Constitution and the General Assembly have fixed the age at which the maid is supposed to be—

"Standing with reluctant feet
Where the brook and river meet,
Womanhood and childhood fleet,"

—at 14 and 16 years respectively; and while those provisions fixing that "age of consent" have no application to the age of marital consent, it is naturally indicative of the legislative sentiment against a marriage under the age of marital consent.

And, too, Section 374 of the Criminal Code, which, although as held in *Davis v. Whitlock*, 90 S. C., 233; 23 S. E., 171; Ann. Cas., 1913-D, 538, "related only to exemptions from criminal prosecution, and conferred no civil rights; * * * it had no effect on the matrimonial bond or civil status of the parties," strongly indicates that such marriages are void. It provides as an exemption to a prosecution for bigamy "where the first marriage took place where either was under the age of consent." Under this protection Linnie Bailey (Reynolds) could not have been .convicted of bigamy by reason of her marriage with the defendant, Sellers. If not, was it not a valid marriage? The implication is strong that the Legislature intended to enact that the previous child marriage was void; for it can be only upon that theory that she would not be guilty of the crime of bigamy.

We know nothing of course of the parties connected with this malodorous quadrangle, but a situation is readily conceivable under which the doctrine proposed to be promulgated in this case would work most deplorable circumstances. Let us suppose the case of a young girl, a child of 11 years, led into a most distressing marriage relation; it continues for a period of a month and a separation takes place; after 12 years of virtuous living and deep regret, she marries a worthy man, bears him children, and leads a happy life; the recording angel has blotted from the scroll the youthful indiscretion. Under the Statute she could not be convicted of bigamy, yet under the proposed judgment in the case at bar she would wear the "Scarlet Letter," an adulteress, with a brood of bastard brats.

Naturally one would suppose that an act which is specifically excepted from the operation of the criminal Statute is specifically permitted. Shall the law say to the woman: "You may not be convicted of bigamy in marrying again under these circumstances, but if you do, I will brand you as an adulteress and your offspring as bastards?" I cannot think so. If not, the marriage of Linnie with Dock Sellers

was a valid marriage, and the marriage of Dock Sellers with Edith Hewitt was bigamous.

Attention must be called to the quotation from 3 R. C. L., 796, in the opinion of Mr. Justice Blease, which is emphasized with apparent approval:

"So a marriage with a person under the age of consent * * * may be a valid basis for a prosecution for bigamy."

I assume that this was cited in support of the general proposition that a voidable marriage may be the basis of a prosecution for bigamy; as a specific statement of the law in this State, it is in conflict with the section from the Criminal Code (374) above referred to, which makes those circumstances a complete defense to the prosecution.

But it is insisted by the learned Justice, upon an analysis of various sections of the Code, that the right of an infant, under the age of consent, either before or at the time of reaching that age, personally, by her own act of disaffirmance, to annul the tentative marriage, has been abrogated by Statute, and that she is remitted to a proceeding in court to have the marriage annulled. He declares:

"We hold that while the common-law rule as to the age of consent for marriage has not been changed in this State, we do conclude that the common-law right of a person to a marriage contract, voidable because of want of age of one of the contracting parties, to annul the same by his or her own act, without a decree of the Court of Common Pleas, has been abrogated, and such marriage may only be declared void by that Court where there has been no cohabitation between the contracting parties."

And again:

"When she came to the age of discretion, to wit, 12 years, if there had been no consummation of the marriage by cohabitation, she could have made application to the Court of Common Pleas for an annulment of that voidable contract, and that Court had the power, for proper cause, to set the marriage aside."

I have not been able, after careful, laborious study of the sections quoted, to find justification for this conclusion.

Section 5531, I respectfully submit, is clearly without application to the point at issue. It provides:

"When the validity of a marriage shall be denied or doubted by either of the parties, the other may institute a suit for affirming the marriage; and, upon due proof of the validity thereof, it shall be decreed to be valid; and such decree shall be conclusive upon all persons concerned."

This statute was intended for the benefit of the party whose marriage was being questioned; not for that of one who desire the annulment of the marriage; and it was specifically held in the case of *Davis v. Whitlock, supra,* cited by Mr. Justice Blease, that that section did not at all affect the jurisdiction of the Court to entertain a suit to have a marriage declared void. If not, it could not affect the right of one, an infant, of his or her own motion, within the proper time, to disaffirm the tentative marriage without the intervention of the Court.

Of course, if the infant either before or at the period of the age of consent disaffirm the marriage, there could be no objection to her going into Court and securing a decree annulling the marriage, but that decree would be only a judicial determination that the marriage had already been annulled by her disaffirmance. If both parties affirmed the marriage when the incompetent had reached the age of consent, the Statute refered to would not be applicable, for there would be no one to doubt or deny the validity of the marriage. As in the other instance, there could be no objection to her going into Court and securing a decree affirming the mariage, but that decree would be only a judicial determination that the marriage had already been confirmed by the affirmation of the parties or by their continued cohabitation after the age of consent had been reached. ·

I think that Section 5532 is equally inapplicable to, and not decisive of, the point at issue. It provides:

"The Court of Common Pleas shall have authority to hear and determine any issue affecting the validity of contracts of marriage, and to declare said contracts void for want of consent of either of the contracting parties, or for any other cause going to show that, at the time the said supposed contract was made, it was not a contract: *Provided,* that such contract has not been consummated by the cohabitation of the parties thereto."

That section was never intended to apply to child marriages, for several reasons: In the first place, if an issue should arise between the parties as to the nonage of one of them, or as to the affirmance of the marriage when such one had attained the age of consent, or as to cohabitation after that time, the Court under its general powers, as indicated in the *Davis v. Whitlock case,* chuld have entertained jurisdiction independently of the Statute. In the scond place, assuming that the appellant's position that the infant marriage was voidable and not void is correct, the ground of want of consent could not be sustained to avoid the marriage, for that is necessarily present in all marriages where one of the parties is under the age of consent; and by the contention of the appellant the child marriage was not void. In the third place, the ground that at the time the supposed contract was made it was not a contract could not be sustained, for, according to the contention, it was a quasi contract, susceptible of being confirmed, and therefore not a void contract. In the fourth place, the proviso shows that child marriages were not considered, for it is expressly reserved that the section does not apply where the contract has been consummated by cohabitation.

In the concluding clause of the extract above quoted from the opinion of Mr. Justice Blease, it is declared:

"And such marriages (child marriages, where one is under the age of consent) may only be declared void by that Court, when there has been no cohabitation between the contracting parties."

If it be true that the child wife of her own motion, even at the time of attaining the age of consent, repudiate or annul the marriage and is obliged to enter the Court to obtain a decree confirming her renunciation of it, she will be met with the proviso relating to cohabitation, and there can be no hope for her anywhere. I do not believe that this is the law; I do not believe that the child wife is capable of consummating that relation by cohabitation; and the fact that she cannot do so is proof conclusive to my mind that the section has no application. "Voluntary cohabitation before the age of consent will not defeat an action for annulment." *Eliot v. Eliot,* 77 Wis., 634; 46 N. W., 806; 10 L. R. A., 568.

If Section 5532 is made applicable, the adherent of that view is obliged to take the further position that cohabitation will bar relief under it, for it is held in the extract from R. C. L., quoted by Mr. Justice Blease, and in the case of *Davis v. Whitlock,* that it applies to all cases of voidable marriages; that is, such as are susceptible of confirmation.

It appears to me an awfully harsh interpretation of the law to declare that a child 11 years old, who may repent of a foolish venture, must, although repudiating it within a month, wait until she becomes of the age of consent and then must go into Court to confirm her renunciation. I think that that is too much to require of one whose immaturity appeals to the protection of the Court and which should exempt her from the operation of a law which not one in a thousand dreamed to exist.

Again it is suggested by the learned Justice that Section 5533 is conclusive of the question at issue. That section provides:

"All marriages contracted while either of the parties has a former wife or husband living shall be void: *Provided,* that this section shall not extend to a person whose husband or wife shall be absent for the space of seven years, the one not knowing the other to be living during that time; nor to

any person who shall be divorced, or whose first marriage shall be declared void by the sentence of a competent Court."

His conclusion is as follows:

"That section declares outright that Linnie's marriage to the defendant was void if her former husband (Reynolds) was living at the time she contracted the marriage with the defendant, unless Reynolds had been absent for the space of seven years and Linnie was not aware that he was living during that time, or unless Linnie had been legally divorced, or unless her marriage to Reynolds had been declared void by the sentence of a competent Court. Since Reynolds had not been absent for the space of seven years, as there had been no divorce, and as her marriage had not been declared void by the sentence (decree) of a competent Court, the language of the section preceding the proviso therein condemned her marriage to the defendant, for the reason that her former husband, Reynolds, was living at that time."

This conclusion is reached upon the assumption that no other exemptions than those mentioned in the proviso can be urged against the validity of the first marriage; with which assumption I do not agree.

It is distinctly held in the *Davis v. Whitlock case* that the exemption in the proviso in reference to seven years' absence cannot have the effect of validating the second marriage, which would be the natural effect of the language employed, for the reason that "this broad construction is not admissible in this State, for under it the State would be unconstitutional as an attempt to provide in effect for a dissolution of the marriage tie. Marriage being indissoluble in this State, the General Assembly cannot enact a Statute providing that absence or any other fact shall produce dissolution while both parties are alive, so that a second marriage would be valid in any sense whatever. The second marriage during the life of the first husband must under the Constitution be absolutely void." So that this exemption in the proviso necessarily passes out.

The section will then read:

"All marriages contracted while either of the parties has a former husband or wife living, shall be void: *Provided,* That this section shall not extend * * * to any person who shall be divorced, or whose first marriage shall be declared void by the sentence of a competent Court."

The Statute does not purport to be exclusive in its proviso, but was intended to provide an exemption for these two particular classes, leaving all other classes to be determined under the main portion of the Section:

"All marriages contracted while either of the parties has a former husband or wife (that is, under a marriage valid at the time of the second marriage) living shall be void."

Section 5522 excepts idiots and lunatics from the statutory authority to contract matrimony; it also expressly forbids marriages between persons sustaining to each other any of the close relationships of affinity and consanguinity therein set out.

Section 5536 declares that any marriage or attempted marriage between a white person and a person of Indian or negro blood shall be unlawful and shall be utterly void and of no effect.

In *Davis v. Whitlock, supra,* it is said of these Statutes and Section 5533:

"Here are three Statutes of the State, declaring that no ceremony and no attempted contract of marriage can have the effect of establishing the relation of husband and wife between persons of the status and the classes mentioned in the Statutes."

Much to my surprise the Court held in *State v. Smith,* 101 S. C., 293; 85 S. E., 958; Ann. Cas., 1917-C, 149, that notwithstanding the express provisions in Section 5522, prohibiting marriages between persons of certain relationship, and notwithstanding the plain implication to the contrary in the cases of *State v. Barefoot,* 2 Rich. (S. C.),

209, and *Davis v. Whitlock,* 90 S. C., 233; 23 S. E., 171;
Ann. Cas., 1913-D, 538, the marriage of a man and a niece
of the half blood, was only voidable, and was sufficient to
sustain a charge of bigamy.   It is not held, however, in that
case or in any other to which my attention has been directed
that even in the case of a voidable marriage it is essential
that a Court decree be obtained to declare it void.   Certainly
not in the cases of marriages between idiots and lunatics
and persons of different prohibited races, which are abso-
lutely void, would such recourse be necessary; and that ·
establishes my position that the proviso in Section 5533
was not intended to be exclusive.   If a white man should
marry a negro woman, should leave her and afterwards
marry a white woman, and should then be indicted for
bigamy in marrying the white woman, would his defense
that his negro marriage was "unlawful," "void, and of no
effect," under the Statute, fail him because he had not gone
into Court and obtained a decree of annulment before he
married the second time?   I hardly think that such a con-
tention would even be suggested.

It is conceded on all sides that if the marriage relation
continues after the incompetent party has attained the age
of consent, the parties will be deemed to have ratified the
prior incomplete contract.   The argument that such a mar-
riage cannot be annulled except by a decree of Court would
apply as well to the matter of affirmance.   I hardly think
that any one would take the position that subsequent
cohabitation would not, without a Court decree, validate
the inchoate imperfect child marriage.

It is said in the opinion of Mr. Justice Blease:

"Prior to the passage of the laws now set forth in the
sections to which we have invited attention, it must have
been apparent *that it was harmful to womanhood* and to
public morals in general to follow the rule of the common
law that either or both parties to a marriage, where the boy
had been under 14 years of age, or the girl under 12 years

of age, should have the right to annul their marital vows where either or both of them had come to the age of discretion, and thus bastardize children who would have been made legitimate in all respects if their father and mother had seen fit to live together for even a day after their arrival at the age of consent. *The General Assembly of South Carolina undoubtedly intended to correct this evil, and we think the Statutes mentioned were enacted for that purpose and have aided in doing so."* (Italics supplied.)

My opinion is that the common law did not go as far as it should have gone. It should have declared such child marriages absolutely void, and, as I have argued, such is the spirit and the decisions of this State. I cannot conceive how the common-law rule of individual annulment can be considered "harmful to womanhood"; it is for her protection, not injury. The improbability of a woman child having children at 12 years is so manifest that the protection of such offspring from the stain of illegitimacy could hardly have entered into the minds of those who established the rule.

It is also said in the opinion:

"It cannot be doubted that one of the main purposes of the proviso in Section 5532 (relating to cohabitation) was to keep children from the stain of illegitimacy."

This necessarily implies that Section 5532 is applicable to child marriages, and, if so, it would in the nature of things be practically impossible, even by a Court decree, ever to get relief; for cohabitation would have occurred in 99 if not 100 per cent. of cases. As I have endeavored to show above it would be monstrous to hold a child bound by cohabitation before the age of consent, and that for that reason the section cannot have any application.

The learned Justice does not appear to have realized that in sustaining the validity of the marriage between Linnie and Reynolds, as of the date of her marriage with Dock Sellers, the Court would go far afield from a commendable

purpose of protecting the young womanhood of the State. The effect of course is to invalidate the latter marriage, and but for the saving clause in Section 374 of the Criminal Code Linnie would be indictable for bigamy. As it is, she would be branded as an adulteress and her children as bastards. If she had been the defendant, upon a charge of adultery with Dock Sellers, I have little doubt that the conclusions would and should have been quite different from those announced in the opinion which has been submitted. It seems to me that the status of the child wife and the legitimacy of her children, after a second marriage, coming as it did after her renunciation of the first, has received scant consideration, that the highly approved argument in favor of the protection of the young women and relieving their offspring from the stain of illegitimacy, has been misapplied, and that her status is much more deserving of the consideration of this Court than that of the grown man of uxorious inclinations, who will be acquitted and free to graze in other pastures green.