8066

DAVIS v. WHITLOCK.

1. MARRIAGE.—THE COURT OF EQUITY HAS JURISDICTION to declare a marriage void *abnitio.* Nor is this power affected by sec. 2158 of Code of 1902.

2. IBID.—IBID.—IBID.—Section 2660 of Code of 1902 does not deprive the Court of the power to declare such marriage void, as a void marriage contract cannot be "consummated."

3. IBID.—Where a woman whose husband has been absent for seven years, without knowledge of his whereabouts or whether he is living, *bona fide* marries, the validity of the marriage depends on whether the former husband was alive at the time the contract was entered

into.  But where the parties to such *bona fide* marriage live as husband and wife during the lifetime of the former husband without knowledge of his being alive, and continue such relation after his death, the marriage is valid from the time of his death.

4. IBID—FRAUD.—Where such woman marries the second husband without disclosing her former relation, he not having made inquiry as to her past life, she committed no fraud upon the second husband in entering into the marriage contract.  Under the facts here the husband's plea of fraud does not commend itself to the Court.

Before DeVore, J., Cherokee, Fall term, 1909.  Reversed.

Action by Wylie S. Davis against Araminta Whitlock. Defendant appeals.

*Messrs. Otts & Dobson,* for appellant, cite: *After death of former husband marital relations continuing, the present marriage becomes valid:* 1 Eng. App. Cas., 686; 52 C. C. A. 568; 108 N. Y. S. 164; 124 Am. St. R. 111; 127 N. W. 313; 125 Mich. 340; 24 Cal. 510; 88 Ind. 494; 4 Johns. 52; 173 N. Y. 266; 6 A. & E. Ann. C. 483; 182 Mass. 476; 3 L. R. A. (N. S.) 244; 60 L. R. A. 605; 64 Am. L. R. 256.

*Mr. Julius E. Boggs,* contra, cites: *Generally as to the contract of marriage:* 1 Hill 10; 5 Rich. Eq. 126; 2 Strob. 10; 26 Cyc. 863, 848; 4 John 52; 23 S. E. 926; 26 Cyc. 904; 51 Barb. 270; Code 1902, 2661; 10 S. C. 502.

December 19, 1911.  The opinion of the Court was delivered by

MR. JUSTICE WOODS.  This action by the plaintiff to have his marriage with the defendant declared null rests on the allegation that the defendant's former husband, William Whitlock, was living at the time of her attempted marriage with the plaintiff, that the defendant concealed the fact of her first marriage from the plaintiff and that he was ignorant of its existence until just before the commencement of this action.

The facts, which are in the main undisputed, we find to be as follows : The defendant, whose maiden name was Araminta Lockhart, married William Whitlock and lived with him for about two years when he abandoned her and went away.    The first year of their residence was spent at Whitlock's home near Jonesville, the second about twenty miles away near Gaffney.  In 1873, having heard nothing of Whitlock since his departure, defendant married one Joe Terry. Six months later Terry in turn deserted her and has never been heard of since.    In the early part of 1879 defendant married A. H. Wood, with whom she lived until his death in 1881.    Finally, she married the plaintiff on May 8, 1887, having first met him at Central, S. C., where she was conducting a boarding house, in 1886.    They lived at Central for twelve or fourteen years, then went to Atlanta for two years, and finally returned to Cherokee county, where they resided until the separation in 1907, a few days before this action was brought.    The evidence as to Whitlock's movements after he abandoned his wife is very indefinite.    His cousin, Munro Whitlock, testified that he came back to Jonesville in 1874 or 1875 for a short while.    About 1886 he came home once more, but soon wandered off.    A year or two later he returned again and remained until his death in October, 1895, though during this time he went away for short intervals.    Defendant testified that she had not seen or heard of Whitlock during all these years from 1868, and that she received about 1901 her first intimation that he had come back to South Carolina, and, after living here for some time, had died in 1895.

It appears that plaintiff and defendant lived agreeably together from the time of their marriage, until a few years before their separation, when plaintiff took to drink, and when under its influence he was abusive of defendant, for which cause she left him.    He admits that up to a few years before the separation she was a faithful and dutiful wife. She admits that, when she married him, she did not know

whether Whitlock was dead or alive and that she made no inquiry about him; and that she did not tell plaintiff of her marriage either to Whitlock or to Terry, saying, "He never told me of his past life, and I never told him of mine. He never asked me." The couple are now between sixty-five and seventy years of age. During their life together by their joint efforts and industry they accumulated about $2,500 worth of property, real and personal, the title to which is in plaintiff.

The special referee, to whom the issues of law and fact were referred, found that, as Whitlock was alive at the date of the marriage, and as no effort was made by defendant to ascertain whether he was dead or alive, the presumption of his death, which would arise from seven years' absence unheard of by her after reasonable diligence and inquiry to ascertain if he were alive, could not avail to sustain her marriage with plaintiff, though she entered into the contract in good faith, and he held the original marriage void. But he held further that, the parties having lived together as man and wife and recognized each other as such for more than ten years after the death of Whitlock—which removed the only impediment to a valid marriage between them—that was sufficient to establish a common law marriage, notwithstanding the invalidity of the original contract.

The Circuit Court concurred in the former, but overruled the latter conclusion, and held that, the original marriage, being void, could not be validated by ratification, and that the relation of the parties to it was therefore adulterous; and that the relation would be presumed to continue until changed by the mutual consent of the parties. Therefore, the cohabitation of the plaintiff and defendant subsequent to the death of Whitlock, without any new agreement, would be referred to the original unlawful relation, and could not afford ground for inferring a subsequent valid marriage. Therefore the marriage was adjudged to be null and void.

The jurisdiction of the Court of Common Pleas to declare a marriage void was not called in question in the Court below, nor in this Court; but since the court of equity in *Mattison* v. *Mattison,* 1 Strobh. Eq. 387, decided in 1847, and *Bowers* v. *Bowers,* 10 Rich. Eq. 551, decided in 1857, held that such jurisdiction was denied to the Courts of this State, we shall first endeavor to show that changes in the constitutional and statute law of the State have destroyed the force of these cases, and that jurisdiction to declare marriages void *ab initio* has been conferred on the Courts of Common Pleas.

The Civil Code of 1902 contains the following provision as section 2661: "All marriages contracted while either of the parties has a former husband or wife living, shall be void: *Provided,* That this section shall not extend to a person whose husband or wife shall be absent for the space of seven years, the one not knowing the other to be living during that time; nor to any person who shall be divorced, or whose first marriage shall be declared void by the sentence of a competent Court."

This law first appears in the Revised Statutes of 1873, and is found in the Codes of 1882 and 1893. A similar provision as to the absence for seven years is found in the act of 1712 (2 Stat. 508), but that related only to exemptions from criminal prosecution, and conferred no civil rights. Section 2658 of the Civil Code expressly forbids marriage between persons sustaining to each other any of the close relationships therein set out, and so makes all attempts to contract such marriages of no effect. Section 2664, taken from the statute passed in 1879 (17 Stat. 3), enacts that any "marriage or attempted marriage" between a white person and a person of the Indian or negro race shall be "utterly void and of none effect."

Here are three statutes of the State, declaring that no ceremony and no attempted contract of marriage can have the effect of establishing the relation of husband and wife

between persons of the status and the classes mentioned in the statutes. There are no limitations except those contained in the proviso to section 2661. It makes no difference if the persons undertaking to contract marriage were not aware of the disability, and so were innocent of any intention to violate the law, or that they have cohabited together as man and wife—their status is that of unmarried persons and their cohabitation unlawful.

Do not such statutes necessarily carry with them the right to persons affected by them to have their status under them adjudicated by the Courts? Or are we forced to the conclusion that in cases of doubt innocent persons must remain all their lives in uncertainty whether they are married or single, whether it be a duty or a crime to discharge the obligations incident to the marriage relation? The evils to society as well as the hardships to individuals which would result from a denial of the power of the Courts to determine these questions are manifest. No less manifest would be the incongruity and reproach to the law of holding that if in the course of the life of the individuals concerned or after their death, it should happen that in any contest over property the validity of the marriage should incidentally arise, the Court could declare the marriage void under the statute law of the State, but could never adjudicate the question in a direct proceeding which would determine not only all property rights, but the many other marital rights recognized by the law, and so important not only to the individual, but to society.

We think it can be made manifest on both principle and authority that such incongruity in the law does not exist, and that the Court of Common Pleas has jurisdiction to decide in a direct proceeding that what purported to be a marriage was and remains in fact a nullity, and that neither party acquired any marital rights thereunder. There ought to be no doubt of the proposition that when the legislative department of the government enacts a law, it is not neces-

sary to provide that the Courts shall have jurisdiction to determine any substantial controversy between individuals that may arise under that law. Such jurisdiction is necessarily implied. Indeed, it seems clear that it would be beyond the power of the law making body to deny to the citizen the right to have adjudicated substantial claims or obligations arising under the statute law of the State. As soon as a statute is enacted, the judicial power attaches to it, and every citizen who has a controversy with respect to a substantial legal claim arising thereunder has a right to invoke the judicial power in the assertion of rights. Not only does this conclusion result from the essential qualities and relations of legislative and judicial powers, and the right of the citizen to invoke the judicial power, but it is directly and clearly expressed in the provision of the Constitution that: "All Courts shall be public, and every person shall have speedy remedy therein for wrongs sustained." Art. I, section 15. The word *wrongs* is here used in its broadest legal sense, embracing every injury to or impairment of legal rights of person or property.

It is too obvious for discussion that a suit to have a marriage declared void *ab initio* involves the assertion and determination of substantial legal rights: for marriage imposes in all cases the legal obligation to refrain from marrying again while the status continues, and the legal obligations of service and support, and in most cases confers the legal right to the custody of children, as well as the right of dower and other property interests. It seems equally obvious that one sustains a legal wrong, that his rights of person and property are impaired when he is restrained from marrying and lives in doubt as to the most solemn and important legal obligations and duties affecting both his person and his property. It is well established that the owner of land or other property states a legal wrong when he alleges that his title is impaired by that which purports to be title in another, but which is in fact a nullity.

This being so, on what possible legal distinction can it be held that one whose rights of both person and property are impaired by a ceremony which purported to impose the obligations of marriage states no wrong sustained within the meaning of the Constitution when he alleges such impairment of his rights?

These general principles would seem to be conclusive of the matter without further discussion but for the cases above cited, denying the jurisdiction under the law as it then stood. In *Mattison* v. *Mattison,* 1 Strobh. Eq. 387, the court of equity was asked to declare a marriage void on the ground that the complainant was suffering from *delirium tremens* at the time of the marriage. The Court held that such causes were cognizable in England by the ecclesiastical courts alone, that the jurisdiction of the ecclesiastical courts was not conferred on the courts of equity in this State and that therefore the court of equity had no jurisdiction of the cause. *Bowers* v. *Bowers,* 10 Rich. Eq. 551, was a suit for partition involving the validity of a marriage between uncle and niece. The Court reaffirmed the rule stated in *Mattison* v. *Mattison,* holding that proximity of relationship was altogether a canonical disability, and was therefore not cognizable by the Courts of this State.

But when these cases were decided there was in this State no statute law declaring marriages between certain persons void. In the case last cited the Court distinctly holds, in the language quoted below, that if there had been such statutes they would have conferred on the Courts of this State jurisdiction to hear suits brought to declare void marriages falling under such statutes. "But the incapacity in respect of proximity of relationship is a *canonical,* and not a *civil,* disability. Neither the Courts of Chancery in England, nor any of the law courts had cognizance of canonical disabilities. When Parliament thought proper to interfere and by the statutes 5 and 6, William IV, c. 54, declared that all marriages, thereafter celebrated between persons within the

prohibited degrees of consanguinity or affinity, should be absolutely void, then the objection came within the cognizance of the courts of common law. 2 Steph. Com. 254. So when the legislature of South Carolina shall have prescribed within what degrees of relationship marriages shall be invalid, the law will be understood by the citizen, and enforced by the Courts."

In addition to this, even if we lay out of view the changes in the statutes, notwithstanding the decisions in *Mattison* v. *Mattison* and *Bowers* v. *Bowers,* the jurisdiction of the Court of Common Pleas may be asserted with confidence on the difference between the jurisdiction conferred by the Constitution of 1790, in force when those cases were decided, and the Constitution of 1895. The reasoning of the Court, as we have seen, was that the jurisdiction to declare a marriage void did not belong, under the common law, to the courts of common law or to the courts of equity, but to the ecclesiastical courts, and the jurisdiction of those courts was not conferred by the Constitution of 1790 upon any Court in South Carolina. But this argument does not apply to the Constitution of 1895, which declares that the Courts of Common Pleas "shall have jurisdiction of all civil cases." Article V, section 15. The Constitution of 1868 contained a similar provision. Article IV, section 15.

In discussing the right under the Constitution of 1868 to apply to the Court of Common Pleas for the assertion of the homestead right, the Court thus states and applies the principle under discussion: "The Court of Common Pleas is the general fountain of justice, and where the rights of a citizen, either derived from the common law or the statutes, are invaded and the power to protect is conferred upon no special jurisdiction, he may seek redress in that Court." *Ex parte* Lewie, 17 S. C. 153; *Howze* v. *Howze,* 2 S. C. 229. The great weight of authority elsewhere is to the effect that courts of equity have jurisdiction to declare marriages void

16—90

even where there is no statute regulating the subject. *Wightman* v. *Wightman,* 4 Johns. Ch. 343; *Freda* v. *Bergman* (N. J.), 76 Atl. 460; *Bickford* v. *Bickford* (N. H.), 69 Atl. 579; 2 Bish. Mar. & Div., sections 291-2.

The jurisdiction conferred on the Courts by the provisions of the Constitution and the statutes above quoted to entertain a suit to have a marriage declared void is clearly not affected by section 2158 of the Civil Code authorizing the institution of a suit to have a marriage doubted or denied by one of the parties declared valid.

It remains to consider the effect of the following statute enacted in 1882 (17 Stat. 681), and appearing now as section 2660 of the Civil Code: "The Court of Common Pleas shall have power to hear and determine any issue affecting the validity of contracts of marriage, and to declare such contracts void for want of consent of either of the contracting parties, or for any other cause going to show that, at the time the said supposed contract was made, it was not a contract: *Provided,* That such contract has not been consummated by the cohabitation of the parties thereto."

This statute, it may be contended, should be construed to mean that in all cases the Court is denied jurisdiction to declare any attempted marriage contract void where there has been cohabitation thereunder between the parties. This construction leaves out of view the significance of the word "consummated" used in the statute. To consummate means to complete, or make perfect. To illustrate, a ceremony having the form of a marriage when one of the parties is a lunatic or under compulsion would not be binding, but the lunatic when reason is restored and the person under compulsion when force is removed, may consummate, that is, complete, the marriage by cohabitation under the attempted contract. In such cases under the proviso of the statute that which was not binding before becomes binding and complete by cohabitation, and cannot be declared null by the Courts.

But clearly the proviso can have no application to that which is in form a marriage contract, but which can never be consummated, that is, made effective, as a marriage. Marriage of a white person and a negro, or of a person having a living spouse, or of a brother and sister, is declared void, and is forbidden by the public policy of the State, as expressed in its statutes. It is impossible, therefore, that such attempts at marriage can be consummated by cohabitation into a complete and lawful marriage; and so the proviso cannot be intended to refer to such marriages. The proviso having no application, there is no escape from the conclusion that the statute expressly authorizes the Courts to declare such attempted marriages void.

There may have been analogy on the question of jurisdiction between a suit for divorce and a suit to have a marriage declared void *ab initio* when both depended on the common, or the canonical law alone; but there is certainly no such analogy now when the Constitution has expressly forbidden divorce, and on the other hand the statutes enacted in accordance with the Constitution have expressly declared certain marriages void. There is no doubt therefore that the Court of Common Pleas had jurisdiction of this action.

On the merits of the case, however, the judgment of the Circuit Court must be reversed and the complaint dismissed. The defendant testified that her husband Whitlock left her about the year 1868, that she had not since heard of him when she married the plaintiff in 1887, and that she did not know him to be living at that time. Upon this point there was no substantial dispute as to the facts. On this branch of the case questions of difficulty arise in the construction of section 2661. That section enacts: "All marriages contracted while either of the parties has a former husband or wife living, shall be void: *Provided,* That this section shall not extend to a person whose husband or wife shall be absent for the space of seven years, the one not knowing the other to be living during that time. * * *"

It is manifest that the statute must be limited in its force and effect by the constitutional provision that no divorce shall ever be allowed in this State; for evidently the General Assembly could not by indirection provide for divorce to take place by reason of seven years' absence.

It is important to observe in the first place that the act of 1712 (2 Stat. 508, I James 1, c. 11), was a criminal statute and provided only that the seven years' absence should exempt from *criminal* prosecution; it had no effect on the matrimonial bond or civil status of the parties. IV Black. Com. 164; *McCarty* v. *McCarty,* 2 Strob. L. 6; *Duke* v. *Fulmer,* 5 Rich. Eq. 121. But by legislative authority section 2661 has been introduced into the Civil Code of the State in the chapter relating to marriage, and it must be given effect according to its terms in fixing the *civil* status of the persons whose matrimonial relations fall under it.

If this last section stood alone, there can be little doubt that the statute would have this meaning and effect: When a husband had departed and had not been heard of for seven years and was not known by his forsaken wife to be alive, a second marriage contracted by the wife would not be void; if the first husband should afterwards be discovered alive, the second marriage would not become void even then, but would be voidable at the instance of any of the parties concerned; the children of the second marriage before the decree of annulment would be legitimate, and property rights acquired on the faith of the second marriage would not be lost. Such was the construction put upon a similar statute by Chancellor Walworth in *Valleau* v. *Valleau,* 6 Paige Chan. 207. But this broad construction is not admissible in this State, for under it the statute would be unconstitutional as an attempt to provide in effect for a dissolution of the marriage tie. Marriage being indissoluble in this State, the General Assembly cannot enact a statute providing that absence or any other fact shall produce dissolution while both parties are alive, so that a second mar-

riage would be valid in any sense whatever. The second marriage during the life of the first husband must under the Constitution be absolutely void. But the statute, notwithstanding, does have a very important effect on the status of the spouse who has been abandoned for seven years as indicated by the statute. He or she may marry again, and while the wife or husband remains absent the parties under the second marriage are entitled to full legal recognition as man and wife with regard to the enforcement of rights and the assumption of obligations as such; but all this must be at the risk that if it turns out that the first spouse was alive at the time the second marriage was undertaken, then the second marriage will be void, and all supposed rights acquired under it will fall to the ground. The second marriage in such a case is like administration on the estate of one supposed to be dead. When such person is shown to be alive the administration is held void. It follows that in this case, as Whitlock, the first husband, was in fact alive and the husband of the defendant at the date the ceremony of marriage was performed between the plaintiff and the defendant, that ceremony was without effect and the attempted marriage void.

But this is not decisive of the case, for the important fact remains that the plaintiff and defendant lived together and held themselves out as husband and wife, after the death of Whitlock and when neither knew that he had been alive at any time during their coverture.

In the case of *Campbell* v. *Campbell*. 1 H. L. Sc. 182, known as the "Broadalbane Case," a married woman eloped and lived in adultery with her paramour, under the public pretense by both that they were married. After the death of the woman's husband they continued to live as before, still holding themselves out to the world as husband and wife. The House of Lords adjudged that though the beginning of the connection was adulterous, yet the relation of marriage commenced as soon as the parties were made

capable of contracting marriage by the death of the woman's husband. The tendency of the Courts of this country is to condemn this case as going too far, and to hold that where the relation began as meretricious, it can not be converted into a marriage by the mere removal of the obstacle to marriage without some subsequent agreement to be husband and wife. But the authorities are unanimous in holding that if a man and woman enter into a contract of marriage, believing in good faith that they are capable of entering into the relation notwithstanding a former marriage, when in fact the marriage is still of force, and after the removal of the obstacle of the former marriage the parties continue the relation and hold themselves out as man and wife, such action constitutes them man and wife from the date of the removal of the obstacle. *Eaton* v. *Eaton,* 66 Neb. 676, 92 N. W. 955, A. & E. Ann. Cases 199 and note; *Adger* v. *Ackerman,* 115 Fed. 124; *Chamberlain* v. *Chamberlain,* 68 N. J. Eq. 736, 62 Atl. 680, 6 A. & E. Ann. Cases 483 and note; 3 L. R. A. (N. S.) 244 and note, 111 Am. St. Rep. 658 and note; 3 *Land* v. *Land,* 206 Ill. 288, 99 Am. St. Rep. 171 and note. In *Collins* v. *Voorhees,* 47 N. J. Eq. 555, 22 Atl. 1054, Chief Justice Beasley thus criticises the "Broadalbane Case," and states the true rule: "The doctrine of that case is supported by nothing that preceded or that has followed it, and is altogether anomolous, and it seems to me, it was properly rejected by this Court. In that case the Court acted upon the principle that if a man and woman agreed to live together adulterously with a simulation of marriage, that there should be an inference of a subsequent valid marriage from the fact that such simulation had been continued after the death of the husband of the adulteress. Why such an inference is to be thus deduced is not apparent, unless it be for the promotion of adultery. By its prevalence the adulterous purpose is controverted into a matrimonial purpose without a particle of reasonable evidence in support of the alleged change of intention. * * * * Lord Westbury

strangely compares the case before him with those instances where the parties intended, originally, to marry, and not to commit adultery, their intent being frustrated by the existence of some unknown obstacle. And yet it is presumed that no one who will look with any care into the subject will have the slightest doubt that these two classes of cases, with respect to the methods of their proof, respectively rest upon entirely different foundations, for when the parties have intended marriage, being ignorant of an existing impediment, all that is to be established by cohabitation apparently matrimonial, subsequent to the removal of such impediment, is the carrying into effect by the parties of their original purpose; but when the original purpose was to live in adultery, the evidence, under similar circumstances, must be sufficient to show an abandonment of such purpose and the execution of a new one. These lines of cases can be confounded only by want of careful observation of the principles upon which they rest."

It may be of interest to notice that before the decision of the cases just cited, it was said in Bish. Mar. & Div., sec. 508 : "The rule *ought* to be—the writer regrets that he cannot refer to any case establishing the rule to be so in actual adjudication—that where the desire for actual, lawful marriage, as distinguished from a living together in the way of concubinage, is shown to exist in the minds of both the parties, and, such desire continuing, they are shown to dwell together as husband and wife but for a single day after the impediment is removed—this shall be held, not merely as raising a *prima facie* presumption of marriage solemnized after the impediment is removed, but as constituting marriage itself. Indeed, there are in such circumstances, both the matrimonial consent and the actual dwelling together in marriage, and there is the legal capacity to intermarry; if these do not constitute matrimony itself, in distinction from the mere evidence of it, where no formal solemnization is required, it is difficult to say what does."

It is not easy to say what was the extent of the holding in *State* v. *Whaley*, 10 S. C. 500, cited by the Circuit Court as conclusive of this case. The decision turned on the following instruction to the jury: "But assuming Pleasants to have been his legal wife, if after her death defendant acknowledged the second marriage to Betsy and recognized her as his legal wife, that this at common law would constitute the third marriage to Charity bigamous." The ground, as we understand, upon which this instruction was held erroneous is thus stated in the opinion: "This part of the charge may readily have been construed as meaning that if after the death of Pleasants the defendant acknowledged the fact of having been married to Betsy Moore during the lifetime of Pleasants, that such an acknowledgment was entitled to be received as evidence of marriage. Such an inference would clearly be erroneous, as that marriage, assuming the original illegality, could not become the source of the legal relation of marriage through any acknowledgment of the fact of its existence." This is, we think, all that the case decides on this subject. It is perfectly obvious, as held by the Court, that no mere acknowledgement or admission by the defendant in that case or by the plaintiff in this, that he had contracted a second marriage while the first was in existence could make the second marriage valid. To produce that effect, there must be as there was in this case, not only profession that the marriage relation was assumed, but the actual continuation in it after the removal of the obstacle which made it invalid at the beginning. We are not inclined to accept any dictum of Chief Justice Willard going beyond this, because we think it contrary to the reason of the matter and to the entire current of judicial thought and expression on the subject.

The position that the defendant was not innocent and that she perpetrated a legal fraud on the plaintiff in that she did not disclose to him her former marriage with Whitlock, is,

we think, unsound.   The plaintiff made no inquiry
4    as to defendant's past life, and the defendant made
no false representations to him with respect to it.
Whitlock, her former husband, having been absent seven
years unheard of, and not known to be alive, neither the
criminal nor the civil law forbade her to enter again into
the relation of marriage, and no wrong nor fraud can be
imputed to her for so doing.   The attempt to be relieved
from the marriage tie comes with ill grace from the plain-
tiff and his charge of fraud does not commend itself to the
Court; for the evidence produces the conviction that his
cruelty drove from her home a woman who had been faith-
ful to him in all the duties of a wife of many years, and
that this suit was commenced because of the separation thus
brought about by the misconduct of the plaintiff, and not
because of the former marriage of the defendant.

The judgment of this Court is that the judgment of the
Circuit Court be reversed, and the complaint dismissed.