# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In Re: The Estate of James Brown a/k/a James Joseph Brown.

Tommie Rae Brown, Respondent,

v.

David C. Sojourner, Jr., in his capacity as Limited Special Administrator and Limited Special Trustee, Deanna Brown-Thomas, Yamma Brown, Venisha Brown, Larry Brown, Terry Brown, Michael Deon Brown, and Daryl Brown, Defendants,

Of whom Deanna Brown-Thomas, Yamma Brown, and Venisha Brown are the Petitioners.

Appellate Case No. 2018-001990

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Aiken County
Doyet A. Early, III, Circuit Court Judge

---

Opinion No. 27982
Heard October 16, 2019 – Filed June 17, 2020

---

## REVERSED AND REMANDED

---

Robert C. Byrd and Alyson Smith Podris, both of Parker Poe Adams & Bernstein, LLP, of Charleston, and Marc

Toberoff, of Toberoff & Associates, PA, of Malibu, California, for Petitioners.

Robert N. Rosen, of Rosen Law Firm, LLC, of Charleston; S. Alan Medlin, of Columbia; Thomas Heyward Carter Jr., Andrew W. Chandler and M. Jean Lee, all of Evans Carter Kunes & Bennett, PA, of Charleston; David Lawrence Michel, of Michel Law Firm, LLC, of Mount Pleasant; Arnold S. Goodstein, of Goodstein Law Firm, LLC, of Summerville; and Gerald Malloy, of Malloy Law Firm, of Hartsville, for Respondent.

———————

**CHIEF JUSTICE BEATTY:** Disputes over the estate of entertainer James Brown (Brown) have persisted in the years since his untimely death on December 25, 2006. In this case, the Court considers an action by Tommie Rae Brown (Respondent) to establish that she is the surviving spouse of Brown under the South Carolina Probate Code. The issue arose in the context of Respondent's claims filed in the Aiken County Probate Court for an elective share or an omitted spouse's share of Brown's estate.[1] Uncertainty as to Respondent's marital status existed because Respondent did not obtain an annulment of her first recorded marriage until after her marriage ceremony with Brown. Respondent's claims were transferred to the circuit court, which granted Respondent's motion for partial summary judgment and denied a similar motion by the Limited Special Administrator and Trustee (LSA). The circuit court found as a matter of law that Respondent was the surviving spouse of Brown. The court of appeals affirmed. *In re Estate of Brown*, 424 S.C. 589, 818 S.E.2d 770 (Ct. App. 2018). This Court granted a petition for a writ of certiorari filed by several of Brown's children (Petitioners)[2] to review the decision of the court of appeals. We reverse and remand.

## I. FACTS

In February 1997, Respondent participated in a marriage ceremony in Texas with Javed Ahmed, a native of Pakistan who was living in the United States.

---

[1] *See generally* S.C. Code Ann. § 62-2-802 (Supp. 2019) (defining surviving spouse in the current codification of the Probate Code); *id.* § 62-2-201 (elective share); *id.* § 62-2-301 (omitted spouse).

[2] Petitioner Venisha Brown passed away in 2018. Petitioners have advised the Court that an action for the appointment of a personal representative is pending.

Ahmed's and Respondent's signatures appear on the application for a marriage license and affirmed that Ahmed was not currently married. The application contained a warning that false statements could result in imprisonment and a fine.

In December 2001, Respondent participated in a marriage ceremony with Brown in South Carolina, after the birth of a son earlier that year.[3] Respondent signed the 2001 marriage license, affirming this was her first marriage. However, Respondent and Ahmed had not divorced and no formal document purporting to terminate or void Respondent's marriage to Ahmed existed at that time.

A third party informed Brown sometime in 2003 that Respondent had been married to Ahmed and was never divorced. In December 2003, Respondent brought an action in South Carolina to annul her marriage to Ahmed.

In January 2004, Brown filed an action to annul his marriage to Respondent, indicating the parties had recently separated. Brown alleged he was entitled to an annulment because Respondent never divorced her first husband, so their purported marriage was void ab initio. Brown asked that Respondent "be required to permanently vacate the marital residence" and noted the parties had executed a prenuptial agreement that resolved all matters regarding equitable division, alimony, and attorney's fees.

A hearing was held in the family court in Charleston County in April 2004, on Respondent's application for an annulment of her marriage to Ahmed. Ahmed did not appear to litigate the claim. Respondent's attorney conceded Ahmed technically was in default, but stated he was not moving to place Ahmed in default. Respondent briefly testified as the sole witness and stated immediately after the marriage, she went to Ahmed's house with her belongings and Ahmed told her that she could not live with him, he already had three wives in Pakistan, and he just wanted to stay in the United States. It is undisputed that Respondent's testimony as to Ahmed's alleged statements was the only evidence before the family court that Ahmed was married at the time of his marriage ceremony with Respondent.

The same day as the hearing, the family court issued an order granting Respondent's request for an annulment. The family court found Ahmed had been adequately served by publication in Texas (his last known residence) after attempts

_____

[3] Prior to her marriage ceremony with Brown, Respondent signed a prenuptial agreement that waived any future claim to an interest in Brown's estate, including the right to an elective share or an omitted spouse's share. No issue is before the Court regarding the prenuptial agreement.

to locate him were unsuccessful, and that he was given notice of the hearing. Citing Respondent's testimony, the family court found Respondent's marriage to Ahmed was void ab initio because (1) their union was bigamous, as Ahmed had three wives and lacked the capacity to marry; (2) the parties never consummated the marriage; and (3) Ahmed fraudulently induced the marriage to stay in the United States.

In May 2004, Brown amended his complaint against Respondent. In the amended complaint, Brown alleged Respondent did not inform him that she had been married and was still married to Ahmed at the time of their marriage ceremony in 2001. Brown asserted S.C. Code Ann. § 20-1-80 prohibited Respondent from entering into another marriage while she was still married to Ahmed. Respondent answered and counterclaimed, seeking a divorce from Brown and support. The actions of Respondent and Brown were ultimately withdrawn and dismissed without prejudice in a consent order filed in August 2004, in which Respondent and Brown agreed to seal the court records, and Respondent agreed to "forever waive any claim of a common[-]law marriage to [Brown], both now and in the future." Respondent and Brown had an on-and-off relationship until Brown passed away on December 25, 2006. They did not have another marriage ceremony following the issuance of the 2004 order declaring Respondent's marriage to Ahmed null and void.

After Brown's death, Respondent and Petitioners filed actions in the Aiken County Probate Court to set aside Brown's 2000 will and charitable trust based on fraud and undue influence. Respondent sought an elective share or an omitted spouse's share of Brown's estate, as well as a share for her son with Brown. The probate court transferred the matters to the circuit court in Aiken County. Respondent and Petitioners reached a settlement with Brown's Estate, and the circuit court issued an order approving the settlement. On appeal, this Court affirmed in part, reversed in part, and remanded the matter to the circuit court, finding the settlement was improper. *Wilson v. Dallas*, 403 S.C. 411, 743 S.E.2d 746 (2013).

In 2014, following the remand, the circuit court took up Respondent's claims for an elective share or an omitted spouse's share of Brown's estate, as well as Respondent's motion for partial summary judgment on the issue of the legal validity of her ceremonial marriage to Brown. The LSA also filed a summary judgment motion, asserting Respondent could not establish that she is Brown's surviving spouse because her marriage to Brown was legally impossible under South Carolina law. The LSA contended Respondent's marriage to Brown in 2001 was invalid because she still had a marriage of record with Ahmed at that time, citing S.C. Code Ann. § 20-1-80 (providing a marriage contracted while a party has a living spouse is void ab initio unless one of several exceptions applies). The LSA also contended that, while the status of Respondent's first marriage is binding on the world (i.e., it

is annulled), the underlying factual findings in the family court's 2004 annulment order (such as the finding that Ahmed had three wives in Pakistan in 1997) were not conclusive as to nonparties who had no opportunity to litigate those points. Petitioners submitted memoranda and documents in support of the LSA's motion and opposed Respondent's motion.[4]  The parties also submitted a Joint Stipulation of Facts summarizing the facts on which they were able to agree.

The circuit court granted Respondent's motion for partial summary judgment on the issue of Respondent's status and denied the LSA's in a 2015 order, finding as a matter of law that Respondent is the surviving spouse of Brown.  The circuit court, relying on the family court's 2004 annulment order (which it found was conclusive of the facts recited therein and binding on Petitioners), ruled Respondent's first marriage to Ahmed was void ab initio due to Ahmed's bigamy, so Respondent had no legal impediment to her marriage with Brown in 2001 and their marriage was valid.  The circuit court further found Respondent and Brown had not annulled their 2001 marriage or divorced prior to Brown's death in 2006.

The court of appeals affirmed the circuit court's determination that Respondent was Brown's surviving spouse.[5]  *In re Estate of Brown*, 424 S.C. 589, 818 S.E.2d 770 (Ct. App. 2018).  The court of appeals reasoned Petitioners lacked standing to challenge the annulment order, just as Brown did not have standing to intervene in the annulment action, and any rights Petitioners have are derivative from Brown.  The court noted Brown availed himself of the method he could use to invalidate his marriage to Respondent by bringing his own annulment action, but the

---

[4] The documents included a 2014 affidavit from a Georgia attorney and a 2008 affidavit from an attorney in Pakistan, both of whom stated they contacted Ahmed (who was in Pakistan) in 2008, and he informed them that he was not married at the time of his 1997 marriage ceremony with Respondent and that he and Respondent lived together after the wedding.  The Georgia attorney stated he spoke to Ahmed by phone in early 2008 and then secured the attorney in Pakistan to follow up with Ahmed in person.

[5] Before the court of appeals issued its opinion, the LSA entered into a settlement agreement with Respondent on behalf of the Estate and was permitted to withdraw from the appeal.  Petitioners indicate the validity of this settlement agreement is the subject of a separate action.

parties agreed to dismiss that action, and Brown did not bring another action during his lifetime.[6]

The court of appeals rejected Petitioners' contention that they were not disputing the annulment order's effect on Respondent's *status*, but only the unchallenged factual findings, such as the fact that Ahmed had three wives at the time of his marriage to Respondent. The court held Petitioners were collaterally estopped from disputing those findings because (1) the annulment was actually litigated, as the family court reviewed the evidence presented and found it was sufficient to meet Respondent's burden of proof; (2) the validity of the marriage of Respondent and Ahmed was determined in the annulment action; and (3) the facts were necessary to support the judgment.

The court of appeals agreed with the circuit court that the 2004 annulment order was conclusive of all facts regarding Ahmed's marriage to Respondent and further found the circuit court did not have subject matter jurisdiction to relitigate the annulment order because only the family court has jurisdiction over annulments.[7] Relying solely on the factual findings in the annulment order, the court of appeals found Ahmed had at least three wives in Pakistan at the time of his marriage ceremony with Respondent in 1997, so Respondent's and Ahmed's marriage was bigamous and void ab initio. Consequently, the court of appeals agreed with the circuit court that Respondent's recorded marriage to Ahmed was not an impediment to Respondent's marriage to Brown, regardless of whether there was an annulment order in place resolving Respondent's first marriage.

The court of appeals acknowledged that in *Lukich v. Lukich*, 379 S.C. 589, 666 S.E.2d 906 (2008), this Court analyzed section 20-1-80 of the South Carolina Code and held an annulment order did not "relate back" to resuscitate a marriage that

---

[6] As part of that settlement, Respondent agreed to never claim she was Brown's common-law wife. Petitioners contend Brown did not believe his marriage to Respondent was valid and wanted to preclude the alternative establishment of a common-law marriage. *See Byers v. Mount Vernon Mills, Inc.*, 268 S.C. 68, 71, 231 S.E.2d 699, 700 (1977) (stating removal of an impediment to marriage does not convert a bigamous marriage to a common-law marriage and noting "there must be a new mutual agreement, either by way of civil ceremony or by way of a recognition of the illicit relation and a new agreement to enter into a common[-]law marriage").

[7] We agree with Petitioners that subject matter jurisdiction is not implicated here. Petitioners did not seek to overturn the annulment or the family court's order.

violated the statute. The court of appeals found Respondent's situation was distinguishable, however, because, unlike in *Lukich*, Respondent's *first* recorded marriage was bigamous (based on the perceived conclusiveness of the findings in the annulment order) and, therefore, void ab initio. As a result, the court of appeals reasoned Respondent's second recorded marriage could not be bigamous because her first recorded marriage was never valid. The court of appeals held the rule announced in *Lukich*—that an annulment order cannot retroactively validate a bigamous marriage—is limited to situations where the first marriage is merely voidable, not void, as voidable marriages are valid until one of the parties elects to end the marriage, but a bigamous marriage is never valid. This Court granted the petition for a writ of certiorari filed by Petitioners.

## II. DISCUSSION

Petitioners contend the court of appeals erred in upholding the circuit court's ruling that Respondent is Brown's surviving spouse as a matter of law. We agree and begin our analysis by examining (A) the effect of the annulment order, followed by (B) the application of section 20-1-80 of the South Carolina Code.

### A.      Effect of In Rem Annulment Order on Nonparties

Petitioners argue the court of appeals erred in holding the findings of fact underlying the 2004 annulment order are binding on them and that they are collaterally estopped from challenging those facts in this estate matter. Petitioners assert the order annulling the marriage of Respondent and Ahmed is an in rem order to establish the parties' status. Petitioners contend, however, that third parties are not bound by the underlying factual findings in the order. Petitioners emphasize that they do not—and concede that they could not—challenge the grant of the annulment to Respondent and its declaration as to Respondent's status, and they state nothing in the current litigation will resurrect Respondent's marriage to Ahmed.

Petitioners maintain the annulment order was effectively obtained by default, as Ahmed did not appear at the hearing, so the facts put forth by Respondent were never litigated by an opposing party. Petitioners assert Respondent has never actually shown that Ahmed had three wives in Pakistan when she married him in 1997; rather, in seeking the annulment, Respondent merely offered her unchallenged testimony that Ahmed made a statement to this effect after their wedding ceremony. Petitioners point out that no marriage certificates or any other evidence has ever been produced to show Ahmed was previously married. Moreover, Respondent has stipulated that she possesses no documents or other tangible evidence to establish that Ahmed was married to someone else when he married her. Petitioners state that,

in the absence of the annulment order being treated as conclusive of the facts recited therein, the court of appeals erred in holding Ahmed had three wives at the time of his marriage ceremony with Respondent, and that Respondent was, therefore, Brown's surviving spouse as a matter of law.[8]

"In rem actions generally are instituted to determine the status of property and the rights of individuals with respect thereto." 1 Am. Jur. 2d *Actions* § 29 (2016). "A proceeding in rem is not confined to determining the status of inanimate things but extends to the status of individuals and their relations to others." *Id.*

Respondent's action for an annulment, in which she served Ahmed with notice by publication, is an action in rem that acts only upon the status of the parties. *See Mazzei v. Cantales*, 112 A.2d 205, 207 (Conn. 1955) ("Marriage does create a status."); 4 Am. Jur. 2d *Annulment of Marriage* § 1 (2018) (both an annulment and a divorce "relate to the marriage status"); *see also Estate of Walton*, 794 P.2d 131, 133 (Ariz. 1990) (stating "the import of designating a proceeding as *in rem* relates to the effect of the judgment"). "It is ancient law that a judgment in rem is *res judicata* as to all the world with regard to the *res* or status that is determined therein." *Presbrey v. Presbrey*, 179 N.Y.S.2d 788, 792 (App. Div. 1958), *aff'd,* 168 N.E.2d 135 (N.Y. 1960).

The Supreme Court of the United States has long recognized, however, that it is misleading to broadly state that an in rem judgment is binding on all the world. The judgment is binding on the world, including nonparties, only as to the decision regarding status, but it is not conclusive or binding on nonparties as to the underlying facts upon which the decision is based, even those facts that are essential to its determination:

> "If a competent court . . . divorces a couple, or establishes a will, . . . the couple is divorced, [and] the will is established as against all the world, whether parties or not, because the sovereign has said that it shall be so. . . . But . . . the judgment, because conclusive on all the world in what we may call its legislative effect, is [not] equally conclusive upon all as an adjudication of the facts upon which it is grounded. On the contrary, those judgments . . . are said to be conclusive evidence of the facts upon which

---

[8] Petitioners also assert there is evidence in the record that Ahmed was not married based on, *inter alia*, his 1997 Texas marriage license with Respondent, in which he affirmed that he was not married, and the affidavits submitted (see *supra* note 4).

they proceed only against parties who were entitled to be heard before they were rendered. . . . We may lay on one side, then, any argument based on the misleading expression that all the world are parties to a proceeding *in rem*. This does not mean that all the world are entitled to be heard; and, *as strangers in interest are not entitled to be heard, there is no reason why they should be bound by the findings of fact, although bound to admit the title or status which the judgment establishes*." We think that this quotation expresses the correct rule and that it is sustained by the decisions of this court.

*Tilt v. Kelsey*, 207 U.S. 43, 52–53 (1907) (emphasis added) (citation omitted) (last omission in original); *see also Gratiot Cty. State Bank v. Johnson*, 249 U.S. 246, 248–49 (1919) (stating a judgment in rem "is not res judicata as to the facts or as to the subsidiary questions of law on which it is based, except as between parties to the proceeding or privies thereto," and observing "[t]he rule finds abundant illustration in cases dealing with decedents' estates and in cases involving the marriage status" (citations omitted)).

"The general rule applicable to proceedings in rem affecting a marital status" is that the judgment is conclusive upon all persons as to existence of the status, but the judgment will not bind anyone personally unless the court has jurisdiction over the individual, and it is not conclusive as to a fact upon which the judgment is based except as between persons who have actually litigated the existence of the fact. *In re Holmes' Estate*, 52 N.E.2d 424, 429 (N.Y. 1943) (quoting Restatement of the Law of Judgments § 74).

We agree with Petitioners that the in rem annulment order simply determined Respondent was *thereafter* free to remarry. The underlying factual findings as to her marriage ceremony with Ahmed and, more specifically, Ahmed's true marital status in 1997, do not bind those who had no opportunity to be heard on the matter. *Cf. Gaines v. Relf*, 53 U.S. 472, 539 (1851) (stating "the naked confession of Desgrange, that he had been guilty of bigamy, . . . is incompetent evidence, and inadmissible against" the executors of Daniel Clark).

To the extent the court of appeals held Petitioners were precluded from contesting any findings in the annulment order because Brown did not pursue his own annulment action against Respondent and Petitioners' rights were derivative from Brown, we find Brown's actions are not determinative of Petitioners' rights. The fact that Brown did not pursue his own annulment action is not determinative

of his marital status in this estate proceeding to ascertain if Brown has a surviving spouse, as a void marriage may be challenged at any time, even after the death of a spouse. *See Morris v. Goodwin*, 148 A.3d 63, 70 n.4 (Md. Ct. Spec. App. 2016) ("[C]ourts have ruled that void marriages may be challenged by third parties after the death of one of the married parties."); *In re Estate of Toutant*, 633 N.W.2d 692, 697 (Wis. Ct. App. 2001) ("[A] marriage can be declared null and void after the death of a spouse."); *see also Estate of Randall*, 999 A.2d 51, 52 (D.C. 2010) (stating "a marriage void *ab initio* is subject to collateral attack at any time whereas a marriage merely voidable cannot be annulled after the death of either spouse" (citation omitted)).

As for the finding of the court of appeals that the doctrine of collateral estoppel precluded Petitioners from examining the underlying factual findings in the annulment order, we find the doctrine is not applicable. Petitioners were not parties to the annulment order, were not privies with a party, and the issue was effectively decided by default, so the issues disputed here were not actually litigated.

"Under the doctrine of collateral estoppel, once a final judgment on the merits has been reached in a prior claim, the relitigation of those issues actually and necessarily litigated and determined in the first suit are precluded as to *the parties and their privies* in any subsequent action based upon a different claim." *Roberts v. Recovery Bureau, Inc.*, 316 S.C. 492, 495–96, 450 S.E.2d 616, 619 (Ct. App. 1994) (emphasis added). The validity of Brown's and Respondent's purported marriage was not litigated in Respondent's annulment action against Ahmed.

In addition, Ahmed did not appear at the annulment proceeding and did not litigate any issue regarding the annulment. Neither the reluctance of Respondent's counsel to move for an entry of default nor counsel's one-sided presentation of evidence alters the fact that the annulment was uncontested. Collateral estoppel does not apply to default judgments because the factual issues were never actually litigated. *See State v. Bacote*, 331 S.C. 328, 331, 503 S.E.2d 161, 163 (1998) ("In the context of a default judgment, collateral estoppel or issue preclusion does not apply because an essential element of that doctrine requires that the claim sought to be precluded actually have been litigated in the earlier litigation." (citing 50 C.J.S. *Judgments* § 797 (1997))); *Kunst v. Loree*, 404 S.C. 649, 746 S.E.2d 360 (Ct. App. 2013) (stating the essential element requiring that the claim was actually litigated is not met where there is a default). Thus, collateral estoppel is not applicable in this case.

Even if the matter had actually been litigated, Petitioners were not parties or in privity with a party. The parties to the annulment action were Respondent and

Ahmed. Respondent argues to this Court (1) that Brown paid for all or part of Respondent's legal fees for the annulment, so he was in privity with Respondent, and (2) since Brown is Petitioners' father, Petitioners are in privity with Brown as his relatives, and (3) Petitioners are, by extension, in privity with a party and are bound by the findings in Respondent's annulment order. Respondent's allegation of privity has no merit. Brown's purported financial assistance in obtaining the annulment, without any evidence that Brown directed or controlled the litigation, does not place him in privity with Respondent and does not bind Petitioners.[9] Moreover, Petitioners' relationship with Brown as his children does not place them in privity with a party. *See Roberts*, 316 S.C. at 496, 450 S.E.2d at 619 ("'Privity' as used in the context of collateral estoppel, does not embrace relationships between persons or entities, but, rather deals with a person's relationship to the subject matter of the litigation. Privity is not established from the mere fact that persons may happen to be interested in the same question or in proving or disproving the same state of facts or because the question litigated was one which might affect such other person's liability as a judicial precedent in a subsequent action." (citation omitted)).

Based on the preceding, we conclude Petitioners are not bound by the factual findings in the annulment order and are not collaterally estopped from litigating whether Ahmed had the capacity to marry Respondent.[10] *See id.* at 496, 450 S.E.2d at 619 ("Due process prohibits estopping some litigants who never had a chance to present their evidence and arguments on a claim, despite one or more existing adjudications of the identical issue which stand squarely against their position."); *cf. Scarboro v. Morgan*, 64 S.E.2d 422, 424 (N.C. 1951) (stating "the heirs-at-law of Everette Scarboro, not being parties to the action in Wilson County, are not bound

---

[9] The parties stipulated that Brown did not intervene in the annulment action, and he was not a client of Respondent's attorney. *See, e.g.*, *E.I. Du Pont de Nemours & Co. v. Sylvania I. Corp.*, 122 F.2d 400, 405 (4th Cir. 1941) (holding "mere assistance in the defense of a case is insufficient to bind a person not joined as a party," as it is participation in the trial and control of the litigation that will bind one who is not a party of record).

[10] The validity of a marriage is usually determined by the jurisdiction where it is contracted and will be recognized in another state unless "such recognition would be contrary to a strong public policy of that State." *Zwerling v. Zwerling*, 270 S.C. 685, 686, 244 S.E.2d 311, 312 (1978) (quoting 52 Am. Jur. 2d *Marriage* § 82). Since Respondent's 1997 marriage to Ahmed occurred in Texas, Texas law could be implicated in determining its validity, but no issue has been raised in this regard. The validity of Brown's South Carolina marriage to Respondent is properly examined under South Carolina law.

by the annulment judgment").  Since the factual findings underlying the annulment order are not conclusive, the grant of summary judgment in favor of Respondent is reversible error.

## B.  Application of Section 20-1-80

Petitioners further contend the court of appeals erred in finding Respondent was Brown's surviving spouse because Respondent's marriage to Brown violated section 20-1-80 of the South Carolina Code as a matter of law, where Respondent did not resolve her first marriage before contracting marriage with Brown.

The South Carolina General Assembly has established detailed procedures regarding the issuance and recordation of marriage licenses and certificates in this state to maintain the accuracy and accessibility of information affecting the public interest.  The General Assembly has deemed it unlawful for any person to contract marriage within this state without first procuring a marriage license.  S.C. Code Ann. § 20-1-210 (2014); *see also id.* § 20-1-280 (imposing a penalty for anyone furnishing a false affidavit to procure a license).

"The form of license and certificate of marriage shall be prescribed and furnished by the State Registrar and shall contain information required by the standard certificate as recommended by the national agency in charge of vital statistics, *all of which are declared necessary for registration, identification, legal, health[,] and research purposes*, with such additions as are necessary to meet requirements imposed by the State."  *Id.* § 20-1-310 (emphasis added).  For uniformity, the Division of Vital Statistics of the Department of Health and Environmental Control (DHEC) is responsible for printing and distributing the forms to be used by all probate courts in this state.  *Id.* § 20-1-320.

A probate court judge or the clerk of court shall issue a license upon the filing of an application, the lapse of at least twenty-four hours, the payment of the fee provided by law, and "the filing of a statement, under oath or affirmation, to the effect that the persons seeking the contract of matrimony are legally entitled to marry, together with the full names of the persons, their ages, and places of residence."  *Id.* § 20-1-230(A).

The probate judge or clerk of court who issued the marriage license must (upon the return of copies by the person who performed the wedding ceremony) "record and index such [marriage] certificate in a book kept for that purpose and send one copy to the Division of Vital Statistics of [DHEC] within fifteen days after the marriage license is returned to his offices."  *Id.* § 20-1-340.  Thereafter, DHEC

must "properly file and index every marriage license and certificate and may provide a certified copy of any license and certificate upon application of proper parties except that upon request the Department of Social Services or its designee must be provided at no charge with a copy or certified copy of a license and certificate for the purpose of establishing paternity or establishing, modifying, or enforcing a child support obligation." *Id.* § 20-1-350.

In section 20-1-80, entitled, "Bigamous marriage shall be void; exceptions," the General Assembly has declared *all* marriages contracted while a party has a living spouse are void, unless one of three specified circumstances is established:

> *All marriages contracted while* either of the parties has a former wife or husband living shall be void. But this section shall not extend [1] to a person whose husband or wife shall be absent for the space of five years, the one not knowing the other to be living during that time, [2] not to any person who shall be divorced[,] or [3] [to any person] *whose first marriage shall be declared void by the sentence of a competent court*.

*Id.* § 20-1-80 (emphasis added). By the plain reading of this statute, the General Assembly has not declared every bigamous marriage void ab initio; there are exceptions. The first two circumstances, absence for five years and divorce, are not implicated here. Petitioners contend the third exception highlighted in section 20-1-80, the party's first marriage has been declared void by a competent court, required Respondent to obtain a court order declaring her first recorded marriage void *before* entering into a second marriage.

Petitioners argue this Court indicated in *Lukich v. Lukich*, 379 S.C. 589, 666 S.E.2d 906 (2008) that section 20-1-80 focuses on the parties' status *at the time a marriage is undertaken*, so an annulment order cannot retroactively validate a bigamous marriage entered into prior to the issuance of the annulment. Petitioners assert it is undisputed that, at the time of Respondent's marriage ceremony with Brown in 2001, she had not annulled her first marriage to Ahmed. Consequently, pursuant to section 20-1-80 and *Lukich*, Respondent's 2004 annulment could not retroactively validate Respondent's 2001 marriage to Brown. Petitioners assert the statute applies on its face to "[a]ll marriages," without limitation, and it requires the first marriage to be "*declared void* by the sentence of a competent court" (emphasis added).

Petitioners state vital public policy concerns underlie section 20-1-80, which "simply requires spouses who have previously obtained a marriage license and participated in a marriage ceremony to annul that marriage before attempting to marry again." Petitioners contend "*Lukich* and its strict construction of Section 20-1-80 are entirely dispositive of this appeal as a matter of law . . . ." They note all annulments declare a defective marriage void ab initio, so Respondent's attempt to distinguish between void and voidable marriages is not warranted in the context of section 20-1-80.

Respondent, in turn, argues the rule in *Lukich* is limited to the facts of that case, which involved a voidable first marriage that was terminated based on a spouse's intoxication, not a marriage that was void ab initio for bigamy. Respondent contends bigamous marriages are not legal marriages and are never valid. Respondent maintains her marriage to Ahmed was void ab initio because Ahmed was already married. As a result, Respondent states, there was no legal first marriage that would serve as an impediment to her marriage to Brown.

Respondent contends a voidable marriage is a valid marriage until one party elects to procure an annulment, and an annulment is not needed for a void marriage. Respondent states this distinction is not at odds with the holding in *Lukich*, which recognized that, although an annulment renders a marriage void ab initio for most purposes, it cannot resurrect a bigamous second marriage because, at the time the second marriage was contracted, the individual had a lawful spouse. Here, however, Respondent asserts she did not have a lawful spouse, as Ahmed did not have the capacity to marry her.

Determining the meaning of a statute is a question of law. *See Town of Summerville v. City of N. Charleston,* 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008) ("Determining the proper interpretation of a statute is a question of law, and this Court reviews questions of law de novo.").

We first note Respondent's arguments presuppose that Petitioners are conclusively bound by the factual finding in the family court's annulment order that Ahmed had three wives in Pakistan (and that his marriage to Respondent was, therefore, bigamous). For the reasons discussed in the preceding section of this opinion, the annulment order does not bind third parties such as Petitioners to this factual finding, as they had no opportunity to contest this point. Further, Respondent has stipulated that she has no evidence that Ahmed had three wives in Pakistan, other than her own (unchallenged) testimony at the annulment hearing regarding Ahmed's alleged statement to this effect. *Cf. Gaines*, 53 U.S. at 534 ("The great basis of human society throughout the civilized world is founded on marriages and legitimate

offspring; and to hold that either of the parties could, by a mere declaration, establish the fact that a marriage was void, would be an alarming doctrine."). Consequently, we agree with Petitioners that the alleged bigamous nature of Respondent's first marriage was never established in this estate matter.

However, even assuming Respondent's first marriage was, in fact, bigamous, we disagree with Respondent's interpretation of section 20-1-80 and this Court's holding in *Lukich*. *Lukich* presented a bright-line rule based on the plain language of the statute—*all* marriages contracted while a party has a living spouse are invalid unless the party's first marriage has been "declared void" by an order of a competent court (assuming the other statutory exceptions do not apply). We noted that, "[i]n construing a statute, we need not resort to rules of construction where the statute's language is plain." *Lukich*, 379 S.C. at 592, 666 S.E.2d at 907.

As we explained in *Lukich*, the statute looks to only a single point in time, the date of contracting the subsequent marriage, and it does not contemplate either a prospective or retroactive perspective:

> The statute *speaks to the status quo at the time the marriage was contracted*, and does not contemplate either a prospective or a retroactive perspective. Any other construction of § 20–1–80 would lead to uncertainty and chaos.

*Id.* at 593, 666 S.E.2d at 907 (emphasis added).

Respondent asserts the effect of the statute (i.e., whether it is retroactive) should turn on the basis for the annulment. We rejected this contention by the appellant in *Lukich*, stating it is the rule set forth in section 20-1-80, not its exceptions, which is paramount. *See id.* at 592 n.2, 666 S.E.2d at 907 n.2. We have previously noted that "[t]his law first appears [in the civil context] in the Revised Statues of 1873 . . . ." *Davis v. Whitlock*, 90 S.C. 233, 237, 73 S.E. 171, 172 (1911). To date, the General Assembly has not carved out any exceptions to the requirement that a party obtain a declaration of voidness from a competent court, and we decline to impose an alternative reading that the General Assembly did not set forth in the plain language of the statute.

We agree with Respondent that most bigamous marriages are void ab initio by law as a matter of public policy. However, also as a matter of public policy, and to protect the state's interest in the accurate recording of marriages, the failure to resolve a prior marriage of record is also undesirable. Section 20-1-80 promotes the

state's need for accurate public records by ensuring a marriage entered in the public record is terminated before an individual enters into another marriage of record. As we stated in *Lukich*, it is the status of the parties *at the time of contracting the subsequent union*, without the official resolution of a prior union, that the statute prohibits in order to protect societal interests. *Cf. Carnie v. Carnie*, 252 S.C. 471, 477, 167 S.E.2d 297, 300 (1969) (observing "the well established proposition that the state itself is a silent party to all divorce proceedings and that it is the duty of the court to protect the interest of the state therein").

As noted above, the General Assembly has set forth detailed procedures to be followed in the recording and indexing of marriage certificates, which it has stated are vital "for registration, identification, legal, health[,] and research purposes." *See* S.C. Code Ann. § 20-1-310. At the time Respondent contracted marriage with Brown, public records showed Respondent entered into a marriage in Texas in 1997 and then a purported marriage in South Carolina in 2001. In our view, section 20-1-80 requires that the resolution of the 1997 marriage be placed upon the public record prior to the subsequent marriage so that the records accurately reflect the parties' status as married or unmarried. *See generally* 11 Am. Jur. 2d *Bigamy* § 4 (2019) (stating where a statute specifies exceptions to bigamy that includes a declaration of voidness by a court, the voidness generally must be declared by a competent court *prior* to entering the second marriage).

While we acknowledge there is some authority for the proposition that a marriage that is deemed void ab initio by statute need not be declared so by a court, we believe section 20-1-80, a civil statute,[11] contemplates an orderly procedure for this determination that precludes a party from unilaterally and privately concluding a prior marriage is defective. Without a formal declaration that a marriage is void by a competent court, the public record will continue to show an existing marriage. Moreover, it is possible that a party could falsely claim (or mistakenly believe) that a marriage is bigamous, so requiring this point to be established in a formal setting with admissible evidence provides a verifiable method for ascertaining the parties' marital status. *Cf. Perlstein v. Perlstein*, 204 A.2d 909, 911–12 (Conn. 1964) (stating a marriage ceremony gives rise to a presumptively valid status of marriage that persists unless and until it is overthrown by evidence in an appropriate judicial proceeding; the court stated "[n]o mere claim of bigamy, whether made in a pleading or elsewhere, would establish that a marriage was bigamous," and "[t]he state's concern in the marriage status of its domiciliaries imperatively demands that the

---

[11] Section 20-1-80, a civil statute, is distinguishable from the criminal offense of bigamy, currently found in section 16-15-10 of the South Carolina Code.

invalidity of the purported marriage be judicially determined before that invalidity be accepted"); *State v. Crosby*, 420 P.2d 431, 433 (Mont. 1966) (reasoning that, where a statute proclaims the methods to avoid a subsequent marriage from being declared bigamous, one of which being that the marriage has been declared void by a court of competent jurisdiction, "such a determination of voidness cannot be made by the person involved"; rather, it must be made by a court of competent jurisdiction).

Public records have long played an essential role in society. Official records are kept of each individual's birth, marriage, divorce, and death. These vital records provide a confirmation of status that can be determinative of a person's rights in many contexts. *See generally Murray v. Supreme Lodge of New England Order of Prot.*, 52 A. 722, 723 (Conn. 1902) ("From a very early period our law has provided for the record of births, deaths, and marriages in some way by some public official. The first act of this kind seems to have been passed in 1664 [], and ever since that time our statute book has contained provisions [regarding] the making and preservation of such records.").

This state's abiding interest in the accuracy of its records regarding a party's marital status is underscored by the fact that a panoply of rights, privileges, and responsibilities are legislatively created by a valid marriage. For example, under the South Carolina Code, a spouse has a vested special equity and ownership right in marital property (§ 20-3-610); may consent to medical treatment for the other (§ 44-66-30); has homestead protections (§ 15-41-30); has the right to bring a claim for loss of consortium (§ 15-75-20); is given preference for appointment as the spouse's guardian (§ 62-5-308); is entitled to various tax benefits, such as the two wage-earner credit for married individuals (§ 12-6-3330); has the right to claim an evidentiary privilege for marital communications (§ 19-11-30); has insurance conversion privileges (§ 38-71-170); has rights to alimony (§ 20-3-130), child custody (§ 20-3-160), and the equitable distribution of property in the event of a divorce (§ 20-3-620); is entitled to pursue a claim for wrongful death of a spouse (§ 15-51-20); may receive an award of workers' compensation benefits as the surviving spouse (§ 42-9-290); and is protected from disinheritance via the provisions for an elective share (§ 62-2-201) and for an omitted spouse's share (§ 62-2-301). These rights, privileges, and responsibilities that are incident to a marriage are universally recognized in other jurisdictions. *See Baehr v. Lewin*, 852 P.2d 44, 59 (Haw. 1993), *as clarified on reconsideration* (May 27, 1993) (outlining "a number of the most salient marital rights and benefits"), and *abrogated by Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); *Baker v. State*, 744 A.2d 864, 883–84 (Vt. 1999) (discussing "the benefits and protections incident to a marriage license").

The recording of a marriage license creates an obstacle to a subsequent marriage until such time as the obstacle is removed by court order. If individuals do not comply with the proper protocols for entering into and documenting a valid marriage under state law, the public records will not be accurate, and the determinations on which those records are based will likewise be faulty. For this reason, compliance serves not only the interests of the individual parties entering into a marriage, but also the public interest, and it advances a state's public policy of affording notice of its residents' status to all concerned.

In the current appeal, because it is undisputed that, at the time Respondent contracted marriage with Brown in 2001, she had not resolved her first recorded marriage (to Ahmed), her marriage to Brown was void ab initio and "there was nothing to be 'revived' by the annulment order" Respondent obtained in 2004. *See Lukich*, 379 S.C. at 592, 666 S.E.2d at 907 (stating a bigamous married is void ab initio and cannot be revived by the subsequent conduct of the parties); 11 Am. Jur. 2d *Bigamy* § 4 (2019) (stating some authorities hold that "voidness of the former marriage must be declared by a court of competent jurisdiction, and the fact that under a civil statute a prior marriage was void from the beginning because of the fact that at the time of the prior marriage the accused had another wife does not render subsequent marriages nonbigamous"); *see also Davis*, 90 S.C. at 246, 73 S.E. at 175 ("The tendency of the courts of this country is . . . to hold that, where the relation began as meretricious, it cannot be converted into a marriage by the mere removal of the obstacle to marriage without some subsequent agreement to be husband and wife.").

The uncertainty that arose as to Respondent's marital status in the current case and the lengthy legal process that ensued, to the detriment of all those concerned, is precisely the type of problem section 20-1-80 addresses by requiring the orderly recording of marriages and any terminations to facilitate the accuracy of the public record.[12] While the inability to readily determine Brown's heirs has needlessly diminished Estate assets, we are concerned that it has also had detrimental effects on numerous unknown persons who are not parties to this appeal. Brown's estate planning documents indicated that he intended the bulk of his wealth to be used to support his charitable trust, which he specifically declared was to "be used solely for

---

[12] Because the preceding issues are dispositive, we need not reach Petitioners' remaining arguments. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (observing an appellate court need not address remaining issues when the determination of another point is dispositive).

the tuition, educational expenses, and financial assistance of . . . children, youth, or young adults ([w]ho are both qualified and deserving)" of financial assistance to further their education in South Carolina and Georgia. *Wilson v. Dallas*, 403 S.C. 411, 417, 743 S.E.2d 746, 750 (2013). The ongoing litigation since Brown's passing has thwarted his expressed wish that his estate be used for educational purposes, a fact confirmed by the parties in this case, who acknowledged that no scholarships have been paid for students to date, a point we find both extraordinary and lamentable.

## III. CONCLUSION

Based on the foregoing, we conclude Respondent is not the surviving spouse of Brown. Consequently, we reverse the decision of the court of appeals and remand the matter to the circuit court for further proceedings. Upon remand, the circuit court shall promptly proceed with the probate of Brown's estate in accordance with his estate plan.

**REVERSED AND REMANDED.**

**KITTREDGE, HEARN and JAMES, JJ., concur. FEW, J., concurring in a separate opinion.**

**JUSTICE FEW:** I completely agree with the majority's well-reasoned analysis of section 20-1-80 of the South Carolina Code (2014) in Section II.B of the majority opinion. I concur in Section II.B and the conclusion the majority sets forth in Section III. Respectfully, I would not reach the issues addressed in Section II.A.